**UNITED STATES of America,**

v.

**Ronnie FUNDERBURK, Defendant.**

**No. 04–CR–189A.**

United States District Court,
W.D. New York.

Feb. 22, 2007.

See, also, 451 F.Supp.2d 509.

Kathleen M. Mehltretter, Acting United States Attorney, Mary C. Kane, of Counsel, Buffalo, NY, for the Government.

Leigh E. Anderson, Esq. Law Office of David J. Seeger, David J. Seeger, of Counsel, Buffalo, NY, for Defendant Richard Mullen.

Joseph J. Terranova, Esq., Hamburg, NY, for Defendant Frederick Nolley.

Loren D. Lobban, The Bullard Lobban Law Group, Buffalo, NY, for Defendant Efrim K. Richardson.

Sean Dennis Hill, Esq., Buffalo, NY, for Defendant Michael Stranc.

Cohen & Lombardo, P.C., Robert N. Convissar, of Counsel, Buffalo, NY, for Defendant Andre Hall.

Terry Granger, Esq., Buffalo, NY, for Defendant Durrian Pressley.

Matthew P. Pynn, Esq., Lockport, NY, for Defendant Yolanda Windley.

Joseph Mistrett, Federal Public Defender, John F. Humann, Assistant Federal Public Defender, Buffalo, NY, for Defendant Lawanda D. Edmond.

Martin L. Schmukler, Esq., New York, NY, for Defendant Joseph Hargrave.

Anne E. Adams, Esq., Buffalo, NY, for Defendant Edward Hearst.

Robert M. Goldstein, Esq., Buffalo, NY, Attorney for Defendant Kevin Weeks.

Nelson S. Torre, Esq., Buffalo, NY, for Defendant Larry Sanger.

Horace A. Hutson, Esq., Buffalo, NY, for Defendant Maure Graham.

John K. Jordan, Esq., Buffalo, NY, for Defendant Willie Morrison.

Joseph M. LaTona, Esq., Buffalo, NY, for Defendant Robert Adams.

Angelo Musitano, Esq., Niagara Falls, NY, for Defendant Joseph Wilkie.

Law Office of J. Glenn Davis, Glenn Davis, of Counsel, Buffalo, NY, for Defendant Justin Palmer J.

Judith M. Kubiniec, Esq., Buffalo, NY, for Defendant Debbie Drake.

Craig Dexter Hannah, Esq., Buffalo, NY, Attorney for Defendant Terrance Askew.

Alan S. Hoffman, Esq., Buffalo, NY, for Defendant Ameer McKnight.

Labin & Buffomante, Richard R. Shaw, II, of Counsel, Williamsville, NY, for Defendant Douglas McPeek.

Herbert R. Johnston, Jr., Esq., Buffalo, NY, for Defendant Kwaine Davis.

John W. Dorn, Esq., Amherst, NY, for Defendant Marvin West.

Lawrence J. Desiderio, Esq., Buffalo, NY, for Defendant Ross Cooper.

LoTempio & Brown, Frank L. LoTempio, Jr., of Counsel, Buffalo, NY, for Defendant Jerome Davis.

Rosenthal, Siegel, Muenkel & Maloney, LLP, Cheryl Meyers–Buth, of Counsel, Buffalo, NY, for Defendant Ayanna Nolley.

Lee Charles LaMendola, Esq., Buffalo, NY, for Terry Mullen.

Burgett & Robbins, Robert A. Liebers, of Counsel, Jamestown, NY, for Defendant Christina Turner.

David Gerald Jay, Esq., Buffalo, NY, for Defendant Robin Gilmore.

Allan P. McCarty, Esq., Hamburg, NY, for Defendant Tiffiani Jackson.

Kevin P. Shelby, Esq., Williamsville, NY, for Defendant Ramona Watson.

John J. Molloy, Esq., West Seneca, NY, for Defendant Howard Degree.

Michael J. Stachowski, Esq., Buffalo, NY, for Defendant Kenya Lee.

Andrew C. LoTempio, Esq., Buffalo, NY, for Defendant Eric Amidon.

Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, Paul J. Cambria, Jr., of

Counsel, Buffalo, NY, for Defendant Ronnie Funderburk.

## ORDER

ARCARA, Chief Judge.

Defendant Ronnie Funderburk filed an omnibus motion on July 15, 2005, requesting, *inter alia,* the suppression of evidence obtained via certain electronic eavesdropping warrants and the suppression of statements defendant allegedly made to law enforcement officers. On October 19, 2005, the case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1)(A). On February 24, 2006, Magistrate Judge Foschio filed a Report and Recommendation, recommending that defendant's motion to suppress evidence obtained via certain electronic eavesdropping warrants be denied. On September 18, 2006, Magistrate Judge Foschio filed an Amended Report and Recommendation, recommending that defendant's motion to suppress his statements be denied.

Defendant filed objections to both Reports and Recommendations on October 23, 2006, and the government filed a response thereto. Oral argument on the objections was held on January 25, 2007.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Reports and Recommendations to which objections have been made. Upon a *de novo* review of the Reports and Recommendations, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of both Reports and Recommendations.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's February 24, 2006 Report and Recommendation and September 18, 2006 Amended Report and Recommendation, the Court denies: (1) defendant's motion to suppress evidence obtained via certain electronic eavesdropping warrants; and (2) defendant's motion to suppress statements defendant allegedly made to law enforcement officers.

Counsel for all the parties in this case shall appear on February 27, 2007 at 9:00 a.m. for a meeting to set a trial date.

SO ORDERED.

## REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

## JURISDICTION

This case was referred to the undersigned by the Hon. Richard J. Arcara on October 19, 2005 for all pretrial matters. The matter is presently before the court for a report and recommendation on Defendants' motions seeking suppression of evidence and as to Defendants Pressley, Edmond and Hargrave, seeking dismissal of the Second Superseding Indictment (Doc. Nos. 130, 132, 137–141, 142–146, 150–152, 154, 172, 182 and 189).

## BACKGROUND

Defendant Richard Mullen and six others, including co-defendants Frederick Nolley, Richardson, Edmond, Stranc, Pressley and Hall, were initially indicted in a five count indictment on July 29, 2004, charging violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 843(b), 846, 848(a), and 18 U.S.C. § 2. (Docket Item No. 1). Specifically, Defendant Richard Mullen is alone charged in Count 1 of the Indictment with knowingly, willfully, intentionally and unlawfully engaging in a continuing criminal enterprise of which he allegedly organized, supervised, and managed, and from which he allegedly obtained substantial income and resources, in violation of 21 U.S.C. § 848 ("Count 1" or

"the CCE Count"). Defendants Richard Mullen, Frederick Nolley, Richardson, Stranc, Hall, Pressley and Edmond were charged with conspiracy to possess with intent to distribute, and to distribute, five kilograms or more of cocaine in violation of 21 U.S.C. § 846 ("Count 2" or "the Conspiracy Count"); Defendants Richard Mullen, Frederick Nolley and Edmond were charged with knowingly, intentionally and unlawfully possessing with intent to distribute five kilograms of cocaine in violation of 21 U.S.C. § 841 ("Count 3"); and Defendants Richard Mullen, Frederick Nolley, Stranc and Edmond were charged with knowingly, intentionally and unlawfully possessing with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. § 841 ("Count 4"). Additionally, Defendant Hall was charged in Count 5 of the Indictment with knowingly, intentionally, and unlawfully possessing with intent to distribute and distribute five grams or more of cocaine in violation of 21 U.S.C. § 841 ("Count 5").

In a Superseding Indictment, filed January 20, 2005, Defendants Windley, Hargrave, Hearst, Weeks, Sanger, Graham, Morrison, Adams, Wilkie, Palmer, Drake, Askew, McKnight, Douglas McPeek, K. Davis, West, Cooper, J. Davis, Ayanna Nolley, Terry Mullen, Turner, Gilmore, Jackson, Watson, Degree, Lee, and Amidon were added as defendants under the Conspiracy Count. (Docket Item No. 52).[1] A Second Superseding Indictment ("the Indictment"), filed on April 28, 2005, added Defendant Funderburk to the Conspiracy Count. (Docket Item No. 116).

By order dated February 4, 2005, June 1, 2005 was established as the deadline for filing all pretrial motions, both dispositive and non-dispositive. (Docket Item No. 81) ("the Scheduling Order"). In accordance with the Scheduling Order, the following motions were filed: Richard Mullen on June 1, 2005 (Docket Item No. 150) ("Eoannou Affirmation"), Frederick Nolley on July 1, 2005 (Docket Item No. 172) ("Terranova Affirmation"), Efrim Richardson on June 1, 2005 (Docket Item No. 145) ("Lobban Affidavit"), Durrian Pressley on June 1, 2005 (Docket Item No. 140) ("Pressley's Motion"), LaWanda Edmond on June 2, 2005 (Docket Item No. 154) ("Humann Affirmation"), Joseph Hargrave on June 2, 2005 (Docket Item No. 152) ("Schmukler Affirmation"), Larry Sanger on May 27, 2005 (Docket Item No. 130) ("Torre Affidavit"), Robert Adams on June 1, 2005 (Docket Item No. 142) ("LaTona Affidavit"), Justin Palmer on May 30, 2005 (Docket Item No. 132) ("Palmer Motion"), Debbie Drake on June 1, 2005 (Docket Item No. 151) ("Drake Motion"), Ross Cooper on June 1, 2005 (Docket Item No. 143) ("Desiderio Affirmation"), Ayanna Nolley on June 1, 2005 (Docket Item No. 138) ("Meyers–Buth Affidavit"), Ameer McKnight on May 31, 2005 (Docket Item No. 137) ("Hoffman Affidavit") and on June 1, 2005 (Docket Item No. 141) ("Hoffman Supplemental Affidavit"), Terry Mullen on June 30, 2005 (Docket Item No. 182) ("LaMendola Affidavit"), Kenya Lee on June 1, 2005 (Docket Item No. 139) ("Stachowski Affirmation"), Michael Stranc on June 1, 2005 (Docket Item No. 144) ("Stranc Motion"), and Ronnie Funderburk on July 15, 2005 (Docket Item No. 189) ("Funderburk's Motion") ("Moving Defendants").[2,3,4,5,6] The Government was

---

**1.** These Defendants, along with six others, were originally charged by complaint filed August 2, 2004 with violations of 21 U.S.C. §§ 842(a)(1), 843(b), 846. (Doc. No. 1).

**2.** Defendant Stranc entered a guilty plea on December 16, 2005. (Docket Item No. 285).

**3.** Included in these motions are requests for certain non-dispositive relief which are ad-

directed to file its response to such motions by August 31, 2005.

On August 30, 2005, the court granted the Government's request for an extension to file its response to Defendants' motions not later than September 2, 2005. (Docket Item No. 216). On September 2, 2005, the Government filed the Government's Response to Omnibus Motion in response to Defendants' motions. (Docket Item No. 223) ("Government's Response"). As noted, oral argument was conducted on October 11, 2005.[7] On February 13, 2006, in response to the court's request for clarification of the Government's Response, the Government filed a Supplemental Response to Government's Response to Defendant's Omnibus Motions. (Doc. No. 328) ("Government's Supplemental Response").

Defendants' motions include requests for suppression of Title III evidence, suppression of evidence obtained pursuant to various search warrants issued on August 2 and 3, 2004, suppression of evidence seized pursuant to a vehicle stop in Kansas and subsequent warrantless search of several Defendants in March 2003, suppression of post-arrest statements made by Defendants Funderburk and Palmer, a hearing pursuant to *Franks v. Delaware*, and dismissal of Count 2 of the Indictment. Based on the following, Defendants' motions should be DENIED in part, and DISMISSED as moot in part.

## FACTS[8]

The charges in the Indictment arise from an investigation conducted by the Drug Enforcement Agency ("DEA") of an alleged cocaine possession and distribution conspiracy. Defendants Richard Mullen, Frederick Nolley, Richardson, Edmond, Stranc, Pressley, Hall, Hargrave, Hearst, Weeks, Sanger, Graham, Adams, Wilkie, Palmer, Drake, Askew, McKnight, McPeek, K. Davis, Cooper, J. Davis, Ayanna Nolley, Terry Mullen, Turner, Jackson,

dressed in a Decision and Order filed contemporaneously with this Report and Recommendation.

4. Although Defendants' motions request a variety of relief, most of Defendants' requests are generalized and only some Defendants provide substantive arguments in support of certain requests. Additionally, Defendants Richard Mullen, Adams, Frederick Nolley, Terry Mullen, Edmond, Hargrave, Pressley, Cooper, Lee, Palmer, Richardson, McKnight and Funderburk request to join in motions made by their co-Defendants. Defendants Ayanna Nolley and McKnight make particular requests to join in their co-Defendants' motions regarding objections filed to the electronic surveillance conducted by law enforcement. Accordingly, the court considers these Defendants as having requested the same relief insofar as each Defendant has standing to make such a request and the relief requested is sought by other Defendants. To facilitate the court's consideration, references to motion papers filed by specific Defendants will be made only with regard to Defendants who provided substantive arguments in support of their respective requests.

5. Defendants Andre Hall, Edward Hearst, Kevin Weeks, Maure Graham, Joseph Wilkie, Terrance Askew, Douglas McPeek, Kwaine Davis, Jerome Davis, Christina Turner, Tiffiani Jackson, Ramona Watson, Howard Degree and Eric Amidon filed no pretrial motions.

6. Defendants Askew, West, Gilmore, Windley and Cooper were dismissed from the case on November 7, 2005, July 14, 2005, August 30, 2005, May 19, 2005 and January 24, 2006, respectively. Accordingly, the court considers all pretrial motions filed by Defendant Cooper to be withdrawn. Defendant Morrison, who had been a fugitive, was arraigned on January 10, 2006.

7. Defendant Richard Mullen's motion to dismiss, filed on November 23, 2005 (Docket Item No. 273), is addressed in a separate Report and Recommendation.

8. Taken from the pleadings and papers filed in this action.

Watson, Degree, Lee, and Funderburk are alleged coconspirators in a drug trafficking conspiracy operating in and around Buffalo, New York. According to the Government, Defendant Richard Mullen is the alleged leader of the drug conspiracy. Defendant Frederick Nolley allegedly distributed the cocaine and collected the drug purchase money. Defendant Richardson was an alleged customer of Richard Mullen's who would convert the cocaine to cocaine base and sell it to his own customers, including Defendants Amidon, McPeek and Wilkie, and others. The Indictment also alleges that Defendant Funderburk, a Buffalo police officer, advised Defendant Frederick Nolley, his brother-in-law, on how to operate a vehicle without attracting police attention, and that Funderburk staged a bogus car stop of Nolley's vehicle to make it appear the police confiscated money from Nolley's vehicle, which the Government asserts was given to Nolley by a drug customer.

In March 2004, DEA agents learned from Defendant Frederick Nolley, then acting as a cooperating witness, that, according to Richard Mullen, in January 2003 one of Mullen's drug couriers, Wesley Alleyene, who was then transporting kilogram quantities of cocaine for Mullen from Los Angeles to Buffalo, was stopped in Nebraska in a vehicle from which 10 kilograms of cocaine was seized. Subsequently, in March 2003, following a traffic stop, police in Kansas seized, from a vehicle rented by Defendant Edmond and driven by Defendant Stranc who was arrested, three kilograms of cocaine, which Mullen had obtained in Los Angeles. Defendants Richard Mullen, Nolley and Edmond were

also stopped while driving through Kansas at the same time in a separate vehicle when Stranc's vehicle was stopped, but although Edmond admitted renting the vehicle Stranc was driving, they denied any knowledge of the cocaine. Following these stops, the DEA began conducting surveillance, including electronic surveillance, of Defendants Richard Mullen, Frederick Nolley and Richardson. Prior to applying for eavesdropping warrants, pen registers were installed on Richardson's cellular telephones. The DEA monitored some calls to Richardson with an informant's consent. Thereafter, the DEA applied for eavesdropping warrants for Richard Mullen, Frederick Nolley and Richardson.

In connection with the investigation, District Judges William M. Skretny and John T. Elfvin issued seven intercept orders pursuant to Title III, 18 U.S.C. § 2510, *et seq.,* from which the Government obtained relevant evidence leading to the Indictment and for use at trial. These intercept orders relate to conversations between Richardson, Frederick Nolley, Richard Mullen and others, transmitted by telephone, cellular phone, or pager, and bear the targeted telephone numbers 716–570–2102, 716–578–2781 (target name: Efrim Richardson); 716–369–0057 (target name: Frederick Nolley—Order I); 716–602–0413 (target name: Frederick Nolley—Order II); 716–578–2614 (target name: Richard Mullen—Order I); 716–818–2697 (target name: Frederick Nolley–Order III); 716–400–7307 (target name: Richard Mullen–Order II); 716–308–0672 (target name: Richard Mullen—Order III) ("the Intercept Orders"). Government's Response at 6.[9,10] The Intercept Orders

---

**9.** Defendant Funderburk cites four additional orders directed to other telephones issued by District Judge Richard J. Arcara and Judge Skretny to allow eavesdropping in this case which Funderburk contends are relevant.

These telephone numbers include (i) land line 716–854–7648, (ii) land line 716–834–6590, and (iii) cellular phone numbers 716–553–7299, 716–316–9179, 716–854–1107, and 716–316–4548. However, the Government

were executed between February 11, 2004 and August 3, 2004. *Id.* at 5. Pursuant to this surveillance, the Government intercepted numerous conversations regarding the alleged possession and distribution conspiracy between Richardson, Frederick Nolley, Richard Mullen and other Defendants.

The Grand Jury subsequently charged Richard Mullen, Richardson, Frederick Nolley, Stranc, Edmond, Pressley, and Hall in the initial indictment filed on July 29, 2004. Several arrests and search warrants were authorized in the instant case, including the search warrants for Richard Mullen's residence at 90 Sussex Street, for his business located at 1202 East Delevan Avenue, and for his 1998 Ford Expedition; for Defendant Palmer's residence at 475 Shirley Avenue; for Defendant Adams's residence at 928 Humboldt Parkway, Upper; for Defendant Cooper's residence at 135 Zenner Street, Upper; and for Defendant Terry Mullen's residence at 90 Sussex, Lower, all located in Buffalo, New York.

Agents searched Richard Mullen's Ford Expedition on August 2, 2004, and arrested Mullen pursuant to a bench warrant. Government's Response at 8. Federal, state and local law enforcement agents executed search warrants on August 3, 2004, in Buffalo and Niagara Falls, New York, and against Mullen's vehicle in Henrietta, New York, resulting in the seizure of numerous items, including (1) currency, (2) cell phones, (3) weapons and ammunition, (4) holsters, (5) cartridges, (6) cartridge magazines, (7) a semi-automatic magazine, (8) drug paraphenalia, (9) unidentified pills, (10) cocaine, (11) cocaine base, (12) crack cocaine, (13) crack stems, (14) marijuana, (15) white powder "and chunks," (16) "white powder substance," (17) "green vegetable matter," (18) a "green, leafy substance," (19) "white, chunky substance," (20) packaging material, (21) scales, (22) two-way radios, (23) paperwork, (24) documents, (25) bank records, (26) automobiles, (27) keys, (28) safes, (29) computers, (30) paystubs, (31) two silver swords, (32) razor blades, at least one of which contained white, powdery residue, (33) a notebook, (34) a computer tower, (35) a heat sealer (36) and a glass plate. Government's Response at 8–11; Government's Supplemental Response at 1.

## DISCUSSION

### I. *Suppression of Intercepted Electronic Communications*

The intercepted communications the Government represents it will use as evidence at trial were authorized by Intercept Order Nos. 04–MISC.CR–15 as to 716–570–2102 ("target telephone I") and 716–578–2781 ("target telephone II") ("Richardson Order I", "Richardson Order I, 1st Extension" and "Richardson Order I, 2nd Extension"); 04–MISC.CR–22 as to Frederick Nolley's pager number 716–369–0057 ("Nolley Order I"); 04–MISC.CR–27 as to 716–602–0413 ("Nolley Order II"); 04–MISC.CR–44 as to 716–578–2614 ("Mullen

represents it will only use evidence derived from the Intercept Orders identified in the above paragraph. As such, the court limits its consideration to the Intercept Orders in the above paragraph and need not consider any challenge to the other wiretap orders obtained in this case.

**10.** The Government cites the pager number for the Nolley Order I as 360–0057. Government's Response at 6. However, the number is noted to be 716–369–0057 in the corresponding ten-day reports and Electronic Communication Service Order. (Intercept Order No. 04–MISC.CR–22). As such, in this Report and Recommendation the court identifies the pager number as 716–369–0057.

Order I"); 04–MISC.CR–55 as to 716–818–2697 ("Nolley Order III"); 04–MISC.CR–75 as to 716–400–7307 ("Mullen Order II"); 04–MISC.CR 81 as to 716–308–0672 ("Mullen Order III"). Government's Response at 6.

Defendants Richard Mullen, Terry Mullen, Sanger, Drake, Ayanna Nolley, McKnight, Lee, Funderburk, and Adams move to suppress any and all evidence derived from electronic eavesdropping in this case, arguing that the Intercept Orders authorizing the eavesdropping activity were not supported by probable cause or necessity in violation of 18 U.S.C. § 2518. *E.g.*, Eaonnou Affirmation ¶ 80. The Government controverts the factual allegations recited by Moving Defendants in support of suppression and Defendants' legal contentions. Government's Response at 6, 34–51. Specifically, the Government maintains (1) probable cause supports all of the Intercept Orders; (2) Judge Skretny was informed in each affidavit in support of each order he issued that the DEA corroborated information provided by Defendant Frederick Nolley, who the Government determined was a reliable informant; (3) Agent Laskowski's original and subsequent affidavits describing the basis for the investigator's determination that CS–4 was reliable was the result of, in part, the informant's participation in "consensually recorded telephone calls for the DEA"; and (4) even if one or more of the orders were not supported by probable cause, Moving Defendants have not shown, under *United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), that as to any of the Intercept Orders "(1) the issuing judge abandoned his detached, neutral role; (2) the agent was dishonest or reckless in preparing his affidavit; or (3) the agents' reliance on any order was not reasonable," thus defeating Defendants' motions even assuming any lack of probable cause. Government Response at 36–39.

## A. *Standing*

Under 18 U.S.C. § 2518(10)(a), only an "aggrieved person" may move to suppress information obtained pursuant to an electronic intercept order. An aggrieved person is defined as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11); *United States v. Fury*, 554 F.2d 522, 525–26 (2d Cir.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977) ("a person who was not named in the wiretap order and was not a party to a conversation intercepted during that tap is not an 'aggrieved person' and may not move to suppress information derived from it.").

Accordingly, the court considers Moving Defendants' challenges to the Intercept Orders only insofar as each Moving Defendant is named in or had conversations intercepted pursuant to any particular order. In this case, Defendants Richard Mullen and Drake are the only Defendants named in each Intercept Order upon which the Government will rely at trial. As such, they have standing to challenge any or all of those orders. Defendant Funderburk challenges the Richardson I and Nolley III Orders (first and second extensions) requesting suppression of the conversations to which Funderburk was a party in Nolley III on the ground that the Richardson I Order, upon which the Nolley III Order was based, was issued without probable cause. Funderburk's Motion ¶¶ 102, 107.

Because Funderburk was not mentioned in any Intercept Order upon which the Government intends to rely but allegedly participated in conversations obtained pursuant to the Nolley III Order, Funderburk only has standing to chal-

lenge the Nolley III Order. 18 U.S.C. § 2510(11); *Fury, supra*, at 525–26 (a person who is a party to an intercepted communication or one "against whom the order was directed" has standing to challenge the order's probable cause foundation or its necessity). However, the basis for Funderburk's challenge to the Nolley III Order is that the affidavits submitted by Task Force Agent Jennifer A. Catania in support of the first and second extensions of the Nolley III Order rely upon and "incorporate by reference each of the previous interception applications and orders, as outlined above, to supply the necessary probable cause for their issuance." Funderburk's Motion ¶¶ 103. As such, Funderburk asserts that he may challenge the probable cause underlying any of the previous orders and, in particular, the probable cause of the Richardson I Order. However, as the court determined, Discussion, *infra*, at 237–40, the Richardson I Order is amply supported by probable cause. Thus, Funderburk's argument that Nolley III is unsupported by probable cause in that Richardson I is unsupported by probable cause is without merit, and his asserted standing need not be addressed as to such incorporated Intercept Orders.

Defendants Lee, Sanger, Terry Mullen, McKnight and Ayanna Nolley have standing to challenge particular Intercept Orders upon which the Government relies insofar as Defendants allege they were parties to an intercepted communication or the target of such communication based on such Intercept Orders. With the exception of Defendant Kenya Lee, who claims to have standing to challenge the intercepted communications by asserting "the Government was able to intercept some phone calls from … Lee to Frederick Nolley," Stachowski Affirmation ¶ 100, Defendants Sanger, Terry Mullen, McKnight

and Ayanna Nolley do not specify under which Intercept Orders their respective conversations were intercepted. For example, Defendants Sanger, Terry Mullen and Ayanna Nolley submit a general contention that each is "an aggrieved person and has standing to contest the electronic surveillance in that [he/she], or a telephone account in [his/her] name, is a named target of such eavesdropping warrants and, further, interception and recording of telephonic communications allegedly involving the Defendant … have been obtained thereby," but fail to identify the specific intercepted conversations to which these Defendants claim to have standing to move to suppress, nor do they allege a basis for standing.[11] Torre Affidavit ¶ 34; LaMendola Affidavit ¶ 36; Meyers–Buth Affidavit ¶ 36. Defendant McKnight moved to join in his co-Defendants' motions to suppress, but fails to identify on what ground McKnight had standing to challenge the intercepted communications, nor did McKnight specify the communications he challenges. Hoffman Supplemental Affidavit ¶¶ 5–6; Hoffman Affidavit ¶ 9(h).

In proceedings held before the undersigned on February 2, 2005, however, the Government acknowledged that Defendant McKnight was intercepted through wiretaps on Defendant Richardson's telephone. Additionally, the court observes that Defendants Sanger and McKnight were named in the portion of the Richardson I Order that was effective from March 12, 2004 through April 11, 2004 and from April 21, 2004 through May 20, 2004, and all other Intercept Orders except for that portion of the Richardson I Order that was effective from February 11, 2004 through March 12, 2004 and the portion of the Nolley II Order that was effective from February 20, 2004 through March 22, 2004

---

11. Bracketed material added.

and from March 2, 2004 through March 31, 2004. As such, Sanger and McKnight have standing to challenge all Intercept Orders the Government will rely on at trial except the Richardson I Order effective from February 11, 2004 through March 12, 2004 and the Nolley II Order effective from February 20, 2004 through March 22, 2004 and from March 2, 2004 through March 31, 2004, in which Sanger or McKnight are not named and pursuant to which they do not specifically allege their communications were intercepted.

Defendant Adams is not named in the portion of the Richardson I Order effective from February 11, 2004 through March 12, 2004 and the Nolley II Order effective from February 20, 2004 through March 22, 2004 and from March 2, 2004 through March 31, 2004, nor were his conversations intercepted thereunder. As such, Defendant Adams lacks standing to challenge these orders. Adams is named in the Mullen I Order effective from March 26, 2004 through April 16, 2004; the Mullen II Order effective from May 7, 2004 through June 7, 2004; the Mullen II Order effective from May 7, 2004 through June 7, 2004; the Mullen III Orders effective from May 28, 2004 through June 26, 2004 and from July 12, 2004 through August 2, 2004; the Richardson I Orders effective from March 12, 2004 through April 11, 2004 and from April 21, 2004 through May 20, 2004; the Nolley III Orders effective from April 12, 2004 through May 12, 2004, from May 21, 2004 through June 19, 2004 and from July 2, 2004 through July 31, 2004; and the Nolley II Order effective from April 2, 2004 through April 30, 2004. Accordingly, Adams has standing to challenge the Intercept Orders in which he is named to the extent described above.

Defendant Terry Mullen is named in the Mullen II Order effective from May 7, 2004 through June 7, 2004; the Nolley II Order effective from April 2, 2004 through April 30, 2004; the Nolley III Order effective from May 21, 2004 through June 19, 2004 and from July 2, 2004 through July 31, 2004; the Mullen III Order effective from May 28, 2004 through June 26, 2004 and from July 12, 2004 through August 2, 2004; and the Richardson I Order effective from April 21, 2004 through May 20, 2004. As such, Defendant Terry Mullen has standing to challenge the Intercept Orders in which he is named as indicated above.

Finally, Defendant Ayanna Nolley is named in the Mullen II Order effective from May 7, 2004 through June 7, 2004; the Mullen III Order effective from May 28, 2004 through June 26, 2004 and from July 12, 2004 through August 2, 2004; the Nolley II Order effective from April 2, 2004 through April 30, 2004; the Nolley III Order; and the portion of the Richardson I Order effective from April 21, 2004 through May 20, 2004. Therefore, Defendant Nolley has standing to challenge the Intercept Orders in which she is named, as stated above.

As discussed, Discussion, *supra*, at 234, although Defendant Lee alleges he was intercepted over some phone calls he made to Frederick Nolley, Lee does not identify under which of the three Nolley Intercept Orders these calls were intercepted. Further, the court notes that Kenya Lee is not named in any of the Nolley Intercept Orders, their related underlying applications, or any applications supporting any Intercept Orders upon which the Government intends to rely at trial. Without specifically identifying under which Nolley Order the conversation(s) were intercepted sufficient to confer standing upon Lee, the court is unable to consider Lee's motion to suppress the Intercept Orders as asserted. *United States v. Magaddino*, 496 F.2d 455, 460 (2d Cir.1974) (burden on defendant to

establish standing to challenge legality of electronic intercept warrants) (citing *United States v. Sacco*, 436 F.2d 780, 784 (2d Cir.1971) ("Defendant has the burden of showing that he has standing to challenge admission of the seized evidence.")). *See also United States v. Osorio*, 949 F.2d 38, 40 (2d Cir.1991) ("Party moving to suppress bears the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.") (citing *Rakas v. Illinois*, 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)); *United States v. Gallo*, 863 F.2d 185, 192 (2d Cir.1988) (motion to suppress wiretap evidence pursuant to 28 U.S.C. § 2518(10)(a)(iii) "to be construed in accordance with standing requirements usually applied to suppression claims under Fourth Amendment.") (citing *Alderman v. United States*, 394 U.S. 165, 175–76 & n. 9, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)), *cert. denied*, 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989). Accordingly, Lee's motion to suppress should be DENIED.[12]

### B. *Probable Cause*

As noted, Defendant Richard Mullen challenges each of the Intercept Orders as issued without probable cause. Eaonnou Affirmation ¶¶ 80–97. Defendant Funderburk challenges the Richardson I and Nolley III Orders on the same basis. Funderburk Motion ¶¶ 107–115. The remaining Moving Defendants who have moved to suppress the intercepted communications argue that the relevant Intercept Orders are deficient based, in part, on a lack of probable cause. Specifically, Defendants Sanger, Ayanna Nolley, and Terry Mullen challenge the probable cause basis for the orders, but do not specify which orders were issued without probable cause, nor do these Defendants provide reasons to support this contention. Defendant McKnight requests that he be allowed to join in his co-Defendants' motions and to assert his standing as an "aggrieved party," but McKnight does not specifically identify any defect upon which a particular order was based, such as the absence of probable cause or a lack of necessity. Hoffman Affidavit ¶ 9(h). Finally, Defendant Lee challenges the probable cause for all of the Intercept Orders, although Lee is not named in any of the orders. Lee also claims to be a party to "some of the intercepted conversations," but does not specify to which conversations he was a party. Stachowski Affirmation ¶ 88. Accordingly, as Lee fails to establish his standing to challenge the Intercept Orders, Discussion, *supra*, at 235–36, Lee's motion should be DENIED.

The same standard for assessing probable cause governs an application to intercept electronic communications over a digital display pager as for a wiretap or eavesdropping warrant issued pursuant to 18 U.S.C. § 2518. *United States v. Rodriguez*, 968 F.2d 130, 135 (2d Cir.1992), *cert. denied*, 506 U.S. 847, 113 S.Ct. 139, 121 L.Ed.2d 92 (1992).[13] Additionally, it is

12. There is no reason to discuss Moving Defendants' standing regarding searches pursuant to warrants issued by the undersigned, as to their respective residences and vehicles, and the Government does not contest such standing.

13. The term "interception" is defined as "the aural *or other* acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical or other device." 18 U.S.C. § 2510(4)(emphasis added). Further, the phrase "or other" was inserted into the definition of "interception" as "part of a modernization of Title III to ensure protection for new forms of communication such as electronic pagers, electronic mail, and computer-to-computer communications." *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir.), *cert. denied*, 506

well settled that the standard for assessing probable cause for an eavesdropping warrant is no different from that required for a search warrant. *United States v. Fury,* 554 F.2d 522, 530 (2d. Cir.1977), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977). In determining whether probable cause for an eavesdropping warrant exists, the issuing officer need only make a practical, common sense decision whether, given the "totality of the circumstances" set forth in the affidavit requesting such warrant, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that evidence of a crime will be obtained through the use of electronic surveillance. *See Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

An affidavit in support of an application for an eavesdropping warrant demonstrates probable cause when it sets forth facts which are sufficient, under the circumstances, to indicate a fair probability of criminal activity. *United States v. Rowell,* 903 F.2d 899, 902 (2d Cir.1990) (citing *Gates, supra,* at 236, 103 S.Ct. 2317). Further, a judge's determination of probable cause should be given great deference by a reviewing court. *Gates, supra,* at 236, 103 S.Ct. 2317; *United States v. Nichols,* 912 F.2d 598, 602 (2d Cir.1990). The resolution of close cases should be determined by the preference accorded to warrants. *United States v. Smith,* 9 F.3d 1007, 1012 (2d Cir.1993).

The court will address only Defendants Mullen's, Funderburk's, Sanger's, Ayanna Nolley's and Terry Mullen's general challenges to probable cause for the relevant Intercept Orders as urged by Moving Defendants. Moving Defendants challenge the Intercept Orders on the basis that the reliability of the confidential informants,

referred to in the respective applications, particularly Frederick Nolley, who provided information upon which the orders, including the Richardson I Order, were issued, was not sufficiently established in the application. Specifically, Defendant Richard Mullen maintains the information provided by Frederick Nolley is inherently unreliable. Eaonnou Affirmation ¶¶ 87–93. Mullen asserts that Nolley cooperated with the Government to avoid future charges in exchange for providing the Government with information while minimizing his own role in the alleged conspiracy. *Id.* ¶¶ 86–87. With regard to the three confidential informants who provided information in the application about Richard Mullen and upon which the investigators relied in securing the Intercept Orders, Mullen argues that in addition to an insufficient showing of reliability, the information provided by these informants failed to establish the requisite probable cause for the orders. *Id.* ¶ 89. Mullen further contends that the first confidential source, CS–1, relied on in the application for the Richardson I order, may only establish probable cause regarding Frederick Nolley's alleged involvement, and not Mullen's, in this case because CS–1 was another drug trafficker who worked for Frederick Nolley and "who gave information in exchange for consideration from the government." *Id.* ¶ 90.

Defendant Mullen further argues that the information proffered by the second confidential informant, CS–2, cannot establish probable cause sufficient to authorize a wiretap order against Mullen because CS–2, who identified Frederick Nolley "in a scheme to facilitate the flight of Michael Stranc from the jurisdiction," does not name Richard Mullen. Eaonnou Affirmation ¶ 91. Mullen also concludes that the

U.S. 847, 113 S.Ct. 139, 121 L.Ed.2d 92 (1992).

third confidential informant, CS–3, does not establish probable cause for Mullen's involvement in the narcotics conspiracy because, although CS–3 describes Defendant Richardson's involvement in the conspiracy, CS–3 does not mention Richard Mullen. Eaonnou Affirmation ¶ 92. Finally, Mullen argues that the fourth confidential informant, CS–4, whom the agents relied upon is unreliable because CS–4 also faces drug charges and only provided information in exchange for leniency. Eaonnou Affirmation ¶ 93.

■ The factors that courts find sufficient to establish the reliability of informants in issuing warrants include that (1) the informant's statements qualified as admissions against penal interest by admitting to personal involvement in the alleged criminal activity, (2) the informants were witnesses to the alleged criminal activity, (3) the statements were corroborated by other investigative techniques such a pen register records, and (4) the informant was not a professional informant. *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir.1990). However, contrary to Moving Defendants' contentions, the reliability of the confidential informants as to each of the Intercept Orders challenged on this basis can be established under one or more of these factors.

■ As stated, Defendant Richard Mullen asserts that the information provided by Frederick Nolley is "inherently unreliable" because of Nolley's interest in diminishing charges filed against Nolley in exchange for his cooperation. Eaonnou Affirmation ¶ 87. At oral argument, counsel for Richard Mullen argued that only conclusory statements as to Richard Mullen were made to secure the Richardson I Order, and nothing from the Mullen I Order was sufficiently incriminating as to support the Mullen II Order. (Docket Item No. 252). The Government counters by maintaining that the DEA was able to corroborate information Frederick Nolley provided to the DEA to support both orders which included information regarding the Stranc and Mullen traffic stops in Kansas, and the related drug seizure from Stranc's car, and that these facts were presented to Judge Skretny, who issued the Mullen II Order, in affidavits submitted in support of each order. Government's Response at 37. Additionally, the Government represented at oral argument that the core probable cause relied upon for the Richardson I Order was the cocaine seizure, in Kansas, from the vehicle in which Stranc was traveling to Buffalo as a drug courier for Mullen's cocaine distribution operation. The Government also contended that Judge Skretny properly considered Frederick Nolley to be a reliable informant, based on factors found in *Rowell, supra,* sufficient to establish the reliability of the wiretap application informants in that Nolley made admissions against his penal interest and that Nolley's statements were corroborated by the DEA. Government Response at 37. This information, coupled with the fact that Nolley admitted to personally participating in Mullen's drug trafficking organization, was also included in DEA Agent Laskowski's affidavit in support of the Richardson I Order and accepted by Judge Skretny. Affidavit of Agent Robert J. Laskowski in Support of Intercept Order No. 04–MISC.–CR–15 ("Laskowski Affidavit") ¶¶ 12–14. Therefore, based on the relevant factors, *Rowell, supra,* at 903, the court finds that Nolley was a sufficiently reliable informant whose statements supported a finding of probable cause for the Richardson I Order.

Defendant Mullen also contends that the information provided by CS–1, CS–2, and CS–3 cannot be relied on to establish probable cause as to Mullen's alleged involve-

ment in the conspiracy. Eaonnou Affirmation ¶¶ 90–92. However, a plain reading of Agent Laskowski's affidavit, submitted in support of the Richardson I Order, reveals that CS–1 was personally involved in drug transactions with members of the Mullen narcotics conspiracy and that CS–1 provided a description of specific conduct by Mullen in furtherance of the conspiracy. Laskowski Affidavit ¶¶ 26–27 ("Upon returning to Buffalo, CS–1 met with Mullen to give him [Mullen] the cocaine," *Id.* ¶ 26;[14] and "Mullen again approached CS–1 and asked if he/she was interested in working as a drug courier.") *Id.* ¶ 27.

The Laskowski affidavit further indicates that Frederick Nolley, CS–1, and CS–3 made admissions against their penal interests in statements to law enforcement. Laskowski Affidavit ¶¶ 12, 23, 42. However, the information proffered by CS–2 concerns only Defendants Stranc and Frederick Nolley, and the information provided by CS–3 implicates only Defendant Richardson. Laskowski Affidavit ¶¶ 41–45. Nevertheless, the court finds that, with regard to the information provided by CS–3, and as presented to Judge Skretny in Agent Laskowski's Affidavit, probable cause was established as to Defendant Richardson in that CS–3 provided such statements against penal interest and the information provided by CS–3 had been corroborated, where possible. Laskowski Affidavit ¶ 42. Therefore, Judge Skretny properly credited CS–3's information as to the existence of the conspiracy. Thus, even assuming CS–3 did not directly attempt to incriminate Mullen, several factors supported CS–3 as a credible source.

Defendant Mullen also attacks the information provided by CS–4, arguing that CS–4 made the purported admissions in exchange for leniency, that CS–4 made conclusory statements regarding Mullen's alleged role in the conspiracy, and that nothing contained in the affidavits establishes CS–4's source of knowledge. Eaonnou Affirmation ¶ 93. However, Defendant Mullen's assessment finds no support in Agent Laskowski's affidavit. For purposes of establishing probable cause, the Second Circuit considers an informant to be reliable if such information "is based on reliable means, such as first-hand observations or second-hand information from reliable sources, rather than unreliable means such as rumor or innuendo," and will find information "sufficiently reliable" where it has been "corroborated in material respects by independent evidence." *United States v. Wagner,* 989 F.2d 69, 72–73 (2d Cir.1993). Here, the information supplied by CS–4 was personally obtained by CS–4 when CS–4 consensually recorded incriminating telephone calls for the DEA, including Richardson's statement that Mullen was one of Richardson's suppliers and that Mullen was assisted by Frederick Nolley who was then cooperating with the DEA. Laskowski Affidavit ¶ 54. Additionally, CS–4 made numerous admissions against penal interest and CS–4's statements were corroborated, where possible, by the DEA investigators. *Id.* The court therefore finds that the agents supplied Judge Skretny with facts supporting CS–4's reliability sufficient to establish probable cause for the Richardson I Order.

Mullen also claims CS–2's information was unreliable on its face as such information was hearsay and not based on first-hand knowledge. However, as discussed, Discussion, *supra,* at 238–39, in this case the wiretap applications at issue are based on information provided by several other confidential informants and Frederick Nolley, in addition to the information as received from CS–2. Accordingly, even if the

---

**14.** Bracketed material added.

information provided by CS–2 and CS–3 were considered to be insufficient to establish probable cause as to Defendant Mullen as a basis for the Richardson I Order, as Mullen contends, the statements provided by Frederick Nolley, CS–1 and CS–4 establish, notwithstanding, the required probable cause against Mullen as each informant either offered statements to the DEA qualifying as admissions against their penal interests, including admitting to personal involvement in the alleged criminal narcotics activity, the information was based on their personal observation of the alleged criminal activity, and CS–1 and CS–4 provided statements corroborated by other investigative techniques such pen register records and Nolley's incriminating information. Laskowski Affidavit ¶¶ 5, 12, 23, 42. *See Wagner*, 989 F.2d at 72–73. *Illinois v. Gates*, 462 U.S. at 214, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place."). *See United States v. Rowell, supra*, at 903. Thus, taken as a whole, the information contained in the affidavits challenged by Moving Defendants set forth facts sufficient to indicate a fair probability of criminal activity in the nature of a wide-spread narcotics trafficking conspiracy involving Richardson and Mullen. *Rowell*, 903 F.2d at 902 (2d Cir.1990) (citing *Gates, supra*, at 236, 103 S.Ct. 2317). As such, Moving Defendants' motions to suppress intercepted electronic communications, resulting from the Intercept Orders, based on this ground should be DENIED.

As stated, Funderburk contends the conversations he was a party to in the Nolley III Order, including the first and second extensions, approved by Judge Skretny, should be suppressed because the Richardson I Order, upon which the Nolley III Order was predicated, was issued without probable cause. Funderburk Motion ¶ 108. Based on its rejection of Moving Defendants' contention that the Intercept Orders were issued without probable cause, Discussion, *supra*, at 236–40, the court has determined that the Richardson I Order, upon which the application for the Nolley III order was based, is supported by probable cause. Thus, Funderburk's challenge to the Nolley III Order for lack of probable cause fails, and his motion to suppress on this ground should be DENIED.

Even if it were assumed that any of the Intercept Orders were issued without probable cause, Moving Defendants have not provided any grounds to conclude the challenged wiretaps would not qualify for the good faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Although the Second Circuit has yet to determine whether *Leon's* good faith exception applies to electronic surveillance such as the intercept orders in this case, other circuits, as well as district courts within the Second Circuit, have so held. *See, e.g., United States v. Moore*, 41 F.3d 370, 376 (8th Cir.1994) (court considered the discretionary language of 18 U.S.C. § 2518(10)(a) combined with the statute's legislative history, which "expresses a clear intent to adopt suppression principles developed in Fourth Amendment cases," to indicate the exclusionary rule applies to § 2518(10)(a) suppression issues), *cert. denied*, 514 U.S. 1121, 115 S.Ct. 1985, 131 L.Ed.2d 872 (1995); *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir.1988) (court analyzed information contained in the wiretap application under the deterrence theory of

the exclusionary rule), *cert. denied,* 489 U.S. 1024, 109 S.Ct. 1149, 103 L.Ed.2d 209 (1989); *United States v. Gotti,* 42 F.Supp.2d 252, 267 (S.D.N.Y.1999) (court extended the good faith doctrine in *Leon* to wiretaps where warrants were not facially deficient and where the agents reasonably relied upon the information contained therein); *United States v. Bellomo,* 954 F.Supp. 630, 638 (S.D.N.Y.1997) (court found "no principled basis" to distinguish wiretap orders from other searches and seizures as to applicability of *Leon)* (citing cases). *But see United States v. Spadaccino,* 800 F.2d 292, 296 (2d Cir.1986) (suggesting, but not holding, that *Leon* may not apply to challenges to intercept orders pursuant to the federal wiretap statute as suppression is a legislative remedy intended to compel compliance with statutory, not only Fourth Amendment, notice requirements).

## C. *Staleness*

■ The Government asserts that Defendant Lee contended certain information supporting the wiretap orders was stale. Government's Response at 38. However, the court's review of Lee's motion indicates no such argument was made. Accordingly, Defendant Lee's motion on this ground should be DISMISSED. At oral argument, Defendant Palmer's attorney alleged that the search warrant issued for Palmer's home was not supported by probable cause because it was stale. Docket Item No. 252. In particular, Palmer's attorney contended there were three alleged conversations that took place between Defendants Richardson and Palmer in March 2004. *Id.* As such, Palmer's attorney argues that there was no probable cause for the search warrant issued in August 2004 because agents could not reasonably have expected to find evidence of criminal activity approximately five months after the

conversation took place. The court does not agree.

" '[T]he principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law.' " *United States v. Rowell,* 903 F.2d 899, 903 (2d Cir.1990) (quoting *United States v. Martino,* 664 F.2d 860, 867 (2d Cir.1981)), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). "Moreover, '[n]arcotics conspiracies are the very paradigm of the continuing enterprises for which courts have relaxed the temporal requirements of non-staleness.' " *Rowell, supra* (citing *United States v. Feola,* 651 F.Supp. 1068, 1090 (S.D.N.Y.1987), *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989)). In *Rowell, supra,* the court held that information as old as 18 months need not be suppressed on the basis of staleness, particularly with regard to the investigation of a narcotics conspiracy. *Rowell, supra,* at 903. Here, the information which Palmer maintains was stale was also obtained during the investigation of a narcotics conspiracy and, as less than six months old at the time of the relevant application, was significantly fresher than the information at issue in *Rowell.* Further, Palmer's attorney offers no authority for his contention that the particular time period applicable to the search warrant for Palmer's residence necessarily invalidates the probable cause foundation for the warrant on staleness grounds. Accordingly, Palmer's staleness claim is without merit and Palmer's motion should be DENIED on that ground.

## D. *Necessity*

Defendants Richard Mullen, Funderburk, Sanger, Ayanna Nolley, Terry Mullen, Lee and Adams challenge the necessity of the initial eavesdrop application and

the necessity of every extension application obtained thereafter. These Defendants contend the Government did not adequately establish that it had employed other, conventional means of investigation without success or the reason why such means, if employed, would not uncover criminal activity as required by 18 U.S.C. § 2518(3)(c) ("§ 2518(3)(c)"). Eoannou Affirmation ¶ 96; Funderburk Motion ¶¶ 107–128; Torre Affidavit ¶ 39; Meyers–Buth Affidavit ¶ 41; LaMendola Affidavit ¶ 41; Stachowski Affirmation ¶¶ 106–109; LaTona Affidavit ¶ ¶ 41, 54. Additionally, Defendants contend that statements proffered by the DEA investigators to show the necessity of such electronic surveillance are conclusory and "boilerplate" in nature, and that the applications for electronic surveillance reference numerous confidential informants that witnessed the narcotics activity, thus demonstrating that wiretapping was not essential to the investigation. Torre Affidavit ¶ 37; Meyers–Buth Affidavit ¶ 39; LaMendola Affidavit ¶ 39; LaTona Affidavit ¶ 54.

The Government contends the Defendants' challenges misunderstand the governing law and ignore the justification for the electronic surveillance in the affidavits submitted in support of the challenged Intercept Orders. Government's Response at 40. Specifically, the Government contends that each supporting affidavit contained facts that were "more than minimally adequate to support … [Judge Skretny's] determination" that electronic interception was warranted and identified the investigative techniques that were attempted or used and included reasons why others were not used. Government's Response at 42–43.[15] The Government therefore submits that this information, as provided to Judge Skretny, was sufficient to determine the necessity of the requested

electronic surveillance. *Id.* (citing *United States v. Ruggiero,* 726 F.2d 913, 924 (2d Cir.1984), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984)). Specifically, in this case, according to the Government, the investigative techniques that either were used, were attempted and failed, or were not used as described in the affidavits submitted include "the use of informants; the use of grand jury subpoenas; the use of physical surveillance; the interview of targets; the review of pen register information; the use of search warrants or trash runs; and the use of undercover agents." Government's Response at 42–43. The Government further contends that electronic surveillance was necessary to obtain a conviction of the members of Mullen's narcotics conspiracy. *Id.* at 42. Finally, the Government argues that Defendants have not made a "substantial" showing that any supporting affidavit was made with "deliberate falsity or reckless disregard for the truth." *Id.* at 44.

■ As required by § 2518(3)(c), an application for an electronic intercept order must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous." The purpose of this requirement is not to render electronic surveillance an investigative tool of last resort, but to apprise the judicial officer of the progress of the investigation and the difficulties inherent in the use of normal investigative techniques. *United States v. Torres,* 901 F.2d 205, 231 (2d Cir.1990), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). Thus, courts have held that the requirement of § 2518(3)(c) must be construed in a practical, common sense and realistic fashion. *United States v. Steinberg,* 525

**15.** Internal quotation omitted and bracketed material added.

F.2d 1126, 1130 (2d Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). The statute does not require that all possible techniques be exhausted in fact before a wiretap may be authorized, but, rather, "[a]n affidavit describing the standard techniques that have been tried and facts demonstrating why they are no longer effective is sufficient to support an eavesdropping order even if every possible means of the investigation has not been exhausted." *United States v. Terry,* 702 F.2d 299, 310 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).

■ In this case, each of the challenged affidavits demonstrates compliance with the necessity requirements for the issuance of Intercept Orders. Specifically, each of the intercept applications include an affidavit from a DEA agent directly involved in the investigation of the alleged narcotics trafficking conspiracy detailing why other investigative techniques are not likely to be effective. Laskowski Affidavit in Support of Intercept Order No. 04–MISC. CR–15 effective from February 11, 2004 through March 12, 2004 (¶¶ 76–95), from March 12, 2004 through April 11, 2004 (¶¶ 89–92), and from April 21, 2004 through May 20, 2004 (¶¶ 41–48); Affidavit of DEA Agent William Donovan ("Donovan Affidavit") in Support of Order No. 04–MISC.CR–22 ¶ 15; Affidavit of DEA Agent Daniel F. Rinaldo ("Rinaldo Affidavit") in Support of Intercept Order No. 04–MISC.CR–27 effective from March 2, 2004 through March 31, 2004 (¶¶ 16–28), and from April 2, 2004 through April 30, 2004 (¶¶ 20–31); Affidavit of DEA Special Agent Dale M. Kasprzyk ("Kasprzyk Affidavit") in Support of Intercept Order No. 04–MISC.CR44 ¶¶ 19–32; Affidavit of DEA Agent Jennifer A. Catania ("Catania Affidavit") in Support of Intercept Order No. 04–MISC.CR–55 effective from April

12, 2004 through May 12, 2004 (¶¶ 18–30), from May 21, 2004 through June 19, 2004 (¶¶ 16–29), and from July 2, 2004 through July 31, 2004 (¶ 65–82); Kasprzyk Affidavit in Support of Order No. 04–MISC.CR–75 ¶¶ 43–58; Kasprzyk Affidavit in Support of Order No. 04–MISC.CR–81 effective from May 28, 2004 through June 26, 2004 (¶¶ 127–141), and from July 12, 2004 through August 2, 2004 (¶¶ 42–59) ("Agents' Affidavits").

Each of these affidavits describes other techniques that have been used in the investigation, including telephone call toll records, pen register analysis, physical surveillance, obtaining the criminal history of the subjects of the investigation, a grand jury subpoena of Moshe Friedlander's bank records and the persons and businesses associated with him relative to a money laundering investigation associated with this case, and why such methods such as grand jury subpoenas, infiltration of the suspected conspiracy by undercover agents and securing search warrants, for example, were impractical at that time. *E.g.,* Laskowski Affidavit in Support of Richardson I Order from February 11, 2004 through March 12, 2004 ¶¶ 76–96. For example, although DEA agents in this investigation had conversations with reliable informants, the agents nevertheless represented they received limited cooperation from such informants. E.g., Laskowski Affidavit in Support of Richardson I Order from February 11, 2004 through March 12, 2004 ¶¶ 22, 34, 37–39, 45. Further, according to Agent Laskowski, targets of the investigation had proven themselves to be conscious of surveillance so that prolonged physical surveillance, required to identify all members of the conspiracy and their *modus operandi,* was ineffective. *Id.* ¶ 90.

Despite such attempted investigative techniques, the full extent of the conspira-

cy including, *inter alia*, the identity of all of its members and their respective distribution networks, the conspiracy's methods of drug supply, particularly the identity of Richardson's and Richard Mullen's narcotics sources of supply in New York City and Los Angeles,[16] the means of financing the purchase of the drugs, the scope of Richard Mullen's and Richardson's narcotics-related activities, the location where drugs and proceeds were stored and the members of the conspiracy and their methods for disposing of the narcotics, could not be readily determined. *E.g.*, Laskowski Affidavit in Support of Richardson Order I from February 11, 2004 through March 12, 2004 ¶¶ 76–78. Similar affidavits, stating that despite use of visual surveillance and pen registers employed against suspected members of the conspiracy for several months during the interceptions and the receipt of informant information, agents were unable to determine the extent of a drug trafficking conspiracy, have been held sufficient to establish the need for an intercept order. *See United States v. Torres*, 901 F.2d 205, 231–32 (2d Cir.1990), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir.1987); *United States v. Puglisi*, 790 F.2d 240, 241–42 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986).

Defendants Adams and Funderburk argue the intercepted communications obtained pursuant to the Richardson I and Nolley III wiretap orders should be suppressed because the orders contravene the Second Circuit's holding that "generalized and conclusory statements that other investigative procedures would prove unsuccessful" are insufficient to establish the requisite necessity for authorizing such an order. LaTona Affidavit ¶¶ 49–54; Funderburk's Motion ¶¶ 117–128 (citing *United States v. Lilla*, 699 F.2d 99, 104 (2d Cir.1983)). Defendants contend that, as in *Lilla*, evidence derived from the orders in the instant case must be suppressed because the statements made in the supporting affidavits do not establish this case is more than a "small time narcotics case." *Id.*

The court finds the facts of the instant case distinguishable from those in *Lilla*. In the instant case, the initial investigation began in March 2003, approximately one year before the Richardson I order was authorized and approximately 1½ years before the initial indictment in this case. During this time, the investigation consisted of obtaining information from at least four informants who provided information to Agent Kasprzyk and Detective Rinaldo regarding the drug trafficking activities of members of the alleged conspiracy, some of which described drug trafficking between New York City and Buffalo, and between New York and Los Angeles; the arrest of Defendant Stranc while transporting narcotics from Los Angeles to Buffalo and the related questioning in March 2003 of Defendants Richard Mullen, Frederick Nolley and Edmond while traveling to Buffalo through Kansas in proximity with Stranc; information regarding the earlier arrest in January 2003 of Wesley Alleyne and Billy Gene Lee in Omaha, Nebraska and a corresponding cocaine seizure; consensually monitored, incriminating calls made by certain informants to Defendant Richardson; toll and pen register analysis over target telephones of interceptees and violators; and surveillance of Richardson, Richard Mullen and Frederick Nolley. Government's Response at 4–7; Laskowski Affidavit in support of

---

**16.** It is relevant that Defendant Stranc was discovered to be transporting narcotics from Los Angeles to Buffalo on behalf of Mullen. Facts, *supra*, at 231.

Richardson Order from February 11, 2004 through March 12, 2004 ¶ 79. As the Second Circuit in *Puglisi, supra,* stated

> This [information] stands in stark contrast to *United States v. Lilla,* 699 F.2d 99, 104–05 (2d Cir.1983), where, less than a month after being informed that Lilla was selling narcotics, and after buying marijuana directly from Lilla, a state trooper obtained an eavesdropping warrant solely on the strength of his representations that no other method would reveal Lilla's co-conspirators.

*United States v. Puglisi,* 790 F.2d 240, 242 (2d Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986).[17]

Here, the extensive investigation that preceded application for the wiretap orders, without identifying the true scope of the conspiracy, the identity of members or related questions such as the exact source of supply and finance of the conspiracy, demonstrated the necessity of such orders. As noted, § 2518(3)(c) does not require all other investigative procedures be exhausted before a wiretap order may be issued. Discussion, *supra,* at 242–43. In *Torres, supra,* the court upheld a wiretap order which followed an extensive, 14–month investigation against a necessity challenge because, unlike the "bare conclusions" contained in the supporting affidavits in *Lilla,* "the affidavits ... convincingly established that the Torres Organization was a large scale operation which could not be adequately surveiled by traditional investigative methods." *Torres,* 901 F.2d at 232. Here, the Mullen conspiracy was geographically wide-ranging and, as alleged by the Grand Jury, involved over 30 co-conspirators.

Under these circumstances, the court finds that, based on the affidavits submitted in support of the Intercept Order applications challenged by Defendants, the interception of electronic communications among the Defendant conspirators was necessary to obtain relevant evidence as other standard investigative techniques were not productive as of the date on which each such application was made. Defendants fail to explain how, as in *Lilla, supra,* standard investigative techniques could have been productively utilized prior to any of the applications or their respective extensions. Thus, the challenged applications amply satisfy the necessity requirement of § 2518(3)(c). Accordingly, Defendants' motion to suppress evidence obtained pursuant to the intercept orders on this basis should be DENIED.

### E. *Minimization and Failure to Record*

■ Defendants Adams, Sanger, Drake, Ayanna Nolley and Terry Mullen contend that the agents "failed to properly minimize their interceptions," in violation of 18 U.S.C. § 2518(5) (" § 2518(5)"). LaTona Affidavit ¶¶ 77–82; Torre Affidavit ¶ 36; Drake Motion Part VIII, ¶ 4; Meyers–Buth Affidavit ¶ 38; LaMendola Affidavit ¶ 38; Government's Response at 44. The court's consideration of this ground for suppression is hampered by Defendants' failure to state which call or series of calls they contend violate the minimization requirement of § 2518(5). *Id.*

Upon a defendant's claim § 2518(5)'s that minimization requirements were not met, the court must determine whether the actions of the agents conducting the telephonic surveillance were reasonable under the circumstances. *Scott v. United States,* 436 U.S. 128, 137, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). It is the government's burden to make a prima facie showing of compliance with § 2518(5)'s mini-

---

17. Bracketed material added.

mization requirements. *United States v. Rizzo*, 491 F.2d 215, 217 n. 7 (2d Cir.), *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974); *United States v. Baker*, 443 F.Supp. 526, 531 (S.D.N.Y.1977). Once a *prima facie* showing is made, the burden shifts to the defendant to show that, despite good faith compliance with the minimization requirements, "substantial unreasonable interception of non-pertinent conversations occurred," to the extent warranting suppression of evidence. *United States v. Ianniello*, 621 F.Supp. 1455, 1470 (S.D.N.Y.), aff'd, 824 F.2d 203 (2d. Cir.1987).

In determining the reasonableness of investigators' compliance with the statutory minimization requirement, the Supreme Court stated that "blind reliance on the percentage of non-pertinent calls is not a sure guide to the correct answer ... there are surely cases ... where the percentage of non-pertinent calls is relatively high and yet their interception was still reasonable." *Scott*, 436 U.S. at 140, 98 S.Ct. 1717. In analyzing the reasonableness of the intercepts, the court must consider such factors as the extent of the conspiracy and number of co-conspirators under surveillance, the stage of the investigation, the length of the conversations being monitored, and the use to which the telephone is typically put by the conspiracy. *Scott, supra*, at 140–42, 98 S.Ct. 1717.

Even in situations where the percentage of non-pertinent calls is arguably large, interception may nonetheless be reasonable. *Scott*, 436 U.S. at 140, 98 S.Ct. 1717. For example, many non-pertinent calls may be short in duration or have been only one-time calls. *Id.* Moreover, incomplete conversations for which there was no answer or conversations lasting less than two minutes need not be minimized, as such a short time frame is "too brief a period for an eavesdropper even with experience to

identify the caller and characterize the conversation." *United States v. Capra*, 501 F.2d 267, 275–76 (2d Cir.1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975). Many of the alleged non-pertinent calls may be ambiguous in nature or in coded language. *Scott, supra*, at 140, 98 S.Ct. 1717 Conversations using coded language may make correct characterization of the conversation, and thus any opportunity to minimize, impossible until the termination of the call. *United States v. Millan*, 817 F.Supp. 1072, 1080 (S.D.N.Y.1993). Under these circumstances, it would be difficult for agents to realize such calls were non-pertinent prior to their termination. *Scott*, 436 U.S. at 141–42, 98 S.Ct. 1717; *See also United States v. Bynum*, 485 F.2d 490, 501 (2d Cir.1973) (in large scale drug conspiracy case, conversations under two minutes "would be too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation as merely social or possibly tainted"), *vacated and remanded on other grounds*, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974).

In the instant case, the Intercept Orders, as challenged by Moving Defendants, with the exception of Intercept Order No. 04–MISC.CR–22 for Defendant Frederick Nolley's pager, effective February 20, 2004 through March 22, 2004, required that all intercepted communications be terminated immediately upon determining that the subject matter of the conversation was unrelated to communications subject to interception under 18 U.S.C. § 2518(5). Intercept Order No. 04–MISC.CR–15 (2/11/04–3/12/04) at 8; Intercept Order No. 04–MISC.CR–15 (1st Extension; 3/12/04–4/11/04) at 8; Intercept Order No. 04–MISC.CR–15 (2nd Extension; 4/21/04–5/20/04) at 8–9; Intercept Order No. 04–MISC.CR–27 (3/2/04–3/31/04) at 7–8; Intercept Order No. 04–MISC.CR–27 (1st

Extension; 4/2/04–4/30/04) at 8; Intercept Order No. 04–MISC.CR–55 (4/12/04–5/12/04) at 8–9; Intercept Order No. 04–MISC.CR–55 (1st Extension; 5/21/04–6/19/04) at 8–9; Intercept Order No. 04–MISC.CR–55 (2nd Extension; 7/2/04–7/31/04) at 8; Intercept Order No. 04–MISC.CR–44 (3/26/04–4/16/04) at 8; Intercept Order No. 04–MISC.CR–75 (5/7/04–6/7/04) at 8–9; Intercept Order No. 04–MISC.CR–81 (5/28/04–6/26/04) at 8–9; Intercept Order No. 04–MISC.CR–81 (7/12/04–8/2/04) at 8–9. Interception was also to be terminated whenever it was determined through voice identification, physical surveillance or otherwise that none of the authorized interceptees, when identified, were participants in the conversation unless the conversation was criminal in nature. *Id.* Monitoring agents were directed to "spot check" minimized conversations to ensure the conversation had not turned to criminal matters. *Id.*

The court's review of the ten-day reports for the target phones subject to the Intercept Orders, prepared in connection with the execution of the Intercept Orders covering the challenged surveillance, submitted by the Government for the target telephone numbers, demonstrates proper minimization efforts by the agents responsible for executing the orders. *E.g.,* 1st Ten–Day Report re: 04–MISC.CR–15 prepared by DEA Agent Mark T. Peterson, which enumerates the total calls intercepted and minimized, as well as those considered pertinent, incomplete, under two minutes, received by an answering machine or pager, or not monitored. Such opportunity for judicial supervision "provides strong support for the government's claim that the minimization requirement has been satisfied." *United States v. Hennings,* 1997 WL 714250 * 11 (W.D.N.Y.1997) (weekly reports provided to Judge Arcara for review supported proper minimization efforts).

In *United States v. Falsetti,* 721 F.Supp. 452 (W.D.N.Y.1988), the court found that investigators were entitled to "broader surveillance than otherwise would have been appropriate, particularly during the earlier stages of the investigation" in a case where there was "a relatively large drug-distribution ring that utilized coded phone conversations, had sources in Arizona and Mexico, and may have included corrupt federal and state officials." *Falsetti, supra,* at 457 (W.D.N.Y.1988) (citing *People v. Floyd,* 41 N.Y.2d 245, 392 N.Y.S.2d 257, 360 N.E.2d 935 (1976)). Here, as in *Falsetti,* a relatively large drug-distribution ring is suspected of intra and interstate narcotics trafficking. Government's Response at 4–7. Further, DEA agents who submitted affidavits in support of the Intercept Orders indicated they believed the group used coded phone conversations and that the alleged conspiracy may, as was the case in *Falsetti, supra,* involve a corrupt Buffalo police officer. Government's Response at 13.

Even if the investigating agents failed to use reasonable efforts to minimize particular intercepted communications as Defendants claim, suppression of all communications intercepted pursuant to any of the challenged Intercept Orders is not the proper remedy absent a "pervasive disregard of the minimization requirement." *United States v. Cirillo,* 499 F.2d 872, 881 n. 7 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974); *United States v. McGuinness,* 764 F.Supp. 888, 900 (S.D.N.Y.1991) (holding exclusion of all evidence obtained through electronic intercept order because of inclusion of some irrelevant conversations, even if irrelevant conversations were listened to in their entirety, is not necessary provided investigating law enforcement officers make good faith effort to achieve minimization). Rather, suppression of all evi-

dence obtained under an Title III intercept order is warranted only when, at a minimum, "a substantial number of non-pertinent conversations ha[ve] been intercepted unreasonably." [18] *Cirillo,* 499 F.2d at 881 (affirming district court's denial of defendant's suppression motion based on failure to minimize, without holding full adversary-type hearing, in the absence of evidence that substantial number of non-pertinent conversations had been intercepted unreasonably). Contrary to Defendants' assertions, the record in this case fails to demonstrate any such pervasive disregard of the minimization requirement and Defendants point to nothing to indicate otherwise.

The court finds that based upon the foregoing analysis, the investigators' affidavits satisfies the Government's burden under § 2518(5) and is "strongly supportive of the claim that the minimization requirement has been satisfied." *Falsetti, supra,* at 458. In contrast, Defendants have failed to point to any examples in this case that, based on the record, they claim demonstrate a material failure to minimize. As such, there has been no showing that the Government's efforts at minimization were sufficiently unreasonable thereby warranting suppression. *United States v. Badalamenti,* 1985 WL 2572, *7 (S.D.N.Y. 1985) (mere fact that wiretap is conducted does not justify minimization hearing "where no colorable issue has been raised by the papers"), *cert. denied,* 495 U.S. 933, 110 S.Ct. 2175, 109 L.Ed.2d 504 (1990). In the absence of any evidence that a substantial number of non-pertinent calls were intercepted unreasonably, no minimization hearing is necessary. *Cirillo, supra,* at 881. The Government has therefore satisfied its burden to establish compliance with 18 U.S.C. § 2518(5)'s minimization requirements, while Moving Defendants have

failed to meet theirs. Defendants' motions to suppress on this ground, therefore, should be DENIED.

 Defendant Adams also moves to suppress based on Agent Laskowski's failure to record a conversation between Adams and Defendant Richardson. LaTona Affidavit ¶¶ 77–82. Adams asserts that Agent Laskowski indicated in one of the surveillance logs "DID NOT RECORD. RL.," referencing a call placed from Richardson's telephone number (716–578–2781) to Adams. *Id.* ¶ 77. Adams argues that 18 U.S.C. § 2518(8)(a) requires the contents of all intercepted communications "be recorded," and thus, based on Laskowski's asserted failure to do so as regards Adams's specific conversation with Richardson, such failure necessitates the suppression of all intercepted communications involving Adams. *Id.* ¶¶ 78–82. The court does not agree. "[A] failure to record, though admittedly a violation of the statute, does not lead to suppression and reversal of the convictions." *United States v. Amanuel,* 2005 WL 3200139 * 4–5 (W.D.N.Y.2005) (quoting *United States v. Clerkley,* 556 F.2d 709, 719 (4th Cir.1977), *cert. denied,* 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978)).

Significantly, Adams does not allege that any intercepted incriminating conversations involving him were recorded out of context. Nor has Adams established that he has been prejudiced by Agent Laskowski's failure to record in this one instance. Under these circumstances, where the minimization requirement has been substantially satisfied by the Government and the failure to record a single conversation constitutes a *de minimus* administrative error measured against the significant number of conversations properly monitored and recorded in this case, suppres-

---

**18.** Bracketed material added.

sion for violation of § 2518(5) is not required. *United States v. DePalma,* 461 F.Supp. 800, 824 (S.D.N.Y.1978) ("Even assuming that out of eleven thousand intercepts, the four conversations were monitored but not recorded by a means unexplained in the testimony, this court cannot find that such instances were more than *de minimus* transgressions of the statute which would not result in suppression."); *United States v. Jenkins,* 758 F.Supp. 1194, 1195 (W.D.Ky.1990) (citing *United States v. Daly,* 535 F.2d 434, 442–43 (8th Cir.1976) (where one of seven agents listened to all intercepted communications and recorded only those he deemed incriminating, the court held the violation was *de minimus* and the minimization requirement was met since that agent "monitored less than 10% of the conversations involved.")). As the Supreme Court has stated, "[n]ot every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.'" *United States v. Chavez,* 416 U.S. 562, 574–75, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). Adams's motion to suppress on this ground should therefore be DENIED.

## II. *Request for a Franks Hearing*

Defendants Adams and Richard Mullen move for a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) asserting that (1) the eavesdrop applications for the Intercept Orders should have informed, but failed to do so, the issuing court of any written documentation describing agreements made between confidential sources, relied upon on the applications, and law enforcement agencies so the court could better assess the credibility of the sources; (2) Agent Kasprzyk's opinion that Richardson was packaging cocaine at 928 Humboldt Parkway was unsupported by facts and was a deliberate attempt by Agent Ka-

sprzyk to mislead the magistrate judge into issuing a search warrant for Richardson's home; (3) no physical surveillance established Adams was present at 928 Humboldt Parkway; and (4) the judge should have determined the reliability of the information contained in the affidavits supporting the wiretap orders. LaTona Affidavit ¶¶ 61–62, 94–96; Eoannou Affirmation ¶ 97.

 Under *Franks,* evidence obtained pursuant to a warrant based on materially false and misleading information is not admissible absent a hearing at which it is determined whether, setting aside the false statements, sufficient independent evidence was presented to the judicial officer such that the warrant was, notwithstanding the tainted information, issued on probable cause. *Franks, supra,* at 155–56, 98 S.Ct. 2674. Moreover, before a defendant is entitled to a hearing to test the truthfulness of a warrant's underlying affidavits, the "defendant must make a 'substantial preliminary showing' that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." *United States v. Salameh,* 152 F.3d 88, 113 (2d Cir.1998) (citing *United States v. Levasseur,* 816 F.2d 37, 43 (2d Cir.1987)), *cert. denied,* 525 U.S. 1112, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999). Additionally, a hearing is not required where an affidavit in support of a search warrant application contains material allegedly presented with "deliberate falsity or reckless disregard" for the truth if "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Franks, supra,* at 171–72, 98 S.Ct. 2674; *United States v. Ferguson,* 758 F.2d

843, 849 (2d Cir.), *cert. denied,* 474 U.S. 841, 106 S.Ct. 125, 88 L.Ed.2d 102 (1985). As relevant here, *Franks* has been limited to the statements contained in the affidavit based on the investigator's personal knowledge and does not extend to the information an informant may have provided to the applicant. *United States v. Wapnick,* 60 F.3d 948, 956 (2d Cir.1995), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1672, 134 L.Ed.2d 776 (1996).

■ In this case, neither Adams nor Mullen has made a "substantial preliminary showing" that the asserted omissions, if true, were material to the probable cause finding upon which the eavesdropping warrants were based. Nor, significantly, has either Defendant made a "substantial preliminary showing" that Agent Kasprzyk, or any other affiant in this case, knowingly and recklessly made false statements in their applications for the eavesdropping warrants such that there could be no reasonable belief that the warrants were issued with probable cause. Accordingly, Adams's and Mullen's requests for a *Franks* hearing are DENIED.

### III. *Request for a Taint Hearing*

Defendants Adams, Cooper, Ayanna Nolley, Drake, Palmer, Sanger and Terry Mullen request the court to conduct a "taint" hearing to ascertain the full effect of the asserted illegal electronic surveillance on the Government's expected evidence at trial in this case, suppressing any resulting evidence obtained by exploiting an initial illegality on the part of the Government during the underlying investigation in this case. The Government maintains that no taint hearing is necessary as Defendants have failed to establish any

illegality in the electronic surveillance at issue. Government's Response at 50–51.

Where a defendant seeks a "taint" hearing, the question presented is whether the evidence to which objection is made has been obtained by the exploitation of illegal government conduct, or by sufficiently different or distinguishable means so as to be "purged," of any initial illegality. *See Brown v. Illinois,* 422 U.S. 590, 597–99, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The proponent of a taint hearing has the initial burden of "producing specific evidence demonstrating taint in a substantial portion of the Government's case against him." *United States v. Sapere,* 531 F.2d 63, 66 (2d Cir.1976); *see also Alderman v. United States,* 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

In this case, the court has found that the Intercept Orders at issue were issued with probable cause, upon a proper showing of necessity, the orders were not improperly executed, and were properly minimized. *Discussion, supra,* at 236–40, 241–45, 245–49. Defendants have thus failed to demonstrate any primary illegality with respect to any of the Intercept Orders, no other potential illegality is alleged by Defendants, and their request for a taint hearing should therefore be DENIED.

### IV. *Suppression of Evidence Obtained From Search Warrants*

Defendants Richard Mullen, Terry Mullen, Palmer, Adams, and Stranc all challenge evidence obtained from search warrants issued in this case.[19] The court addresses Defendants' challenges as follows:

---

**19.** As noted, Defendant Stranc entered a guilty plea on December 19, 2005, and his motion is therefore deemed withdrawn. (Docket Item No. 285).

**A.** ***Defendant Richard Mullen's challenge to evidence obtained pursuant to the search warrants executed on August 2, 2004 at his residence, place of business and for his 1998 Ford Expedition[20]***

██ Defendant Richard Mullen argues that evidence obtained pursuant to the warrants for his residence at 90 Sussex Place in Buffalo, New York, for his place of business at 1202 E. Delevan Avenue in Buffalo, and for his 1998 Ford Expedition, which was searched in Henrietta, New York, must be suppressed. Eaonnou Affirmation ¶¶ 98–108; Supplemental Response to Government's Response to Defendants' Omnibus Motions ¶ 1 ("Government's Supplemental Response") (Docket Item No. 328). Specifically, Mullen contends that (1) the affidavit supporting the search warrants contains information which is the fruit of an illegal search (the Intercept Orders directed to Mullen), and that (2) Agent Kasprzyk's allegations in his affidavit in support of the challenged search warrants, dated August · 2, 2004, do not constitute probable cause. Eoannou Affidavit ¶¶ 98–101. For example, Mullen contends that his asserted use of the Ford Expedition is insufficient to demonstrate probable cause to secure the vehicle. Eoannou Affidavit ¶ 107. The Government argues that Agent Kasprzyk's affidavit supports a finding of probable cause for each search warrant and that Kasprzyk specifically informed the issuing magistrate judge that the Defendant was charged with numerous drug trafficking offenses in a sealed Indictment. Government Response at 51. The Government further contends that the Indictment constitutes *"prima facie* proof of the existence of probable cause that defendant had committed the crimes charged therein," that Kasprzyk's affidavit was the result of a 20–month investigation and 13 Title III electronic surveillance orders. *Id.* at 53. The Government does not specifically address Mullen's contention that the search warrant for his vehicle, the Ford Expedition, was without probable cause.

The Government also acknowledges that Agent Kasprzyk admitted he had "no specific information" connecting the drugs to Richard Mullen's residence at 90 Sussex in Buffalo, New York in his affidavit. Government Response at 54. However, the Government submits that "after admitting he had no specific information that the drugs were being stored at defendant's residence, ... [Agent Kasprzyk] sought a so-called "books and records" search warrant" for these locations, relying on *United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985) where the court determined an agent's expert opinion that drug traffickers typically keep material related to the conspiracy in their homes is a factor contributing to good faith. Government Response at 54. Finally, the Government, referring to Kasprzyk Affidavit ¶ 106(h), maintains that Mullen failed to demonstrate that Agent Kasprzyk made any "deliberately false" statements or that the Agent demonstrated a "reckless disregard for the truth" to warrant a *Franks* hearing. *Id.*

As stated, Agent Kasprzyk admitted he had "no specific information" connecting the drugs to Mullen's residence in his affidavit. Agent Kasprzyk Affidavit ¶ 106.

---

**20.** The initial Indictment upon which the arrest and search warrants were based was filed on July 29, 2004, and alleged the conspiracy was in existence from September 2001 to the date the Indictment was returned, Doc. No. 1 at 2; the Second Superseding Indictment filed April 28, 2005 alleged the conspiracy existed until August 3, 2004. Doc. No. 116 at 3.

In his affidavit, however, Kasprzyk further explains that based on his experience and participation in narcotics investigations, dealers involved in narcotics trafficking, such as those who deal in quantities of cocaine and heroin, frequently maintain at their residences or places of business, or other secure premises to which they have access, cocaine, heroin, and currency to finance their business, as well as books, records, receipts, names and addresses of associates, and other papers relative to their narcotics distribution organization, firearms, ammunition, and paraphernalia for packaging, diluting, cutting, weighing, processing and distributing narcotics. *Id.* ¶ 106(a)-(g). As such, Agent Kasprzyk requested a so-called "books and records" search warrant for Mullen's residence. ¶ 106(h); Government Response at 54. Specifically, in his affidavit, Kasprzyk relied upon the opinion in *United States v. Fama, supra,* which states

> While probable cause to arrest does not necessarily give rise to probable cause to search ... [the affiant] had stated in the affidavit that his ten [sic] year experience as a DEA agent had taught him the major drug traffickers frequently maintain at their homes large amounts of cash, drugs, books, ledgers, and other documents evidencing their criminal activities. A number of cases have ruled that an agent's expert opinion is an important factor to be considered by the Judge reviewing a warrant application. * * * Thus it should also be a factor contributing to objective good faith.[21]

*United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985) (internal citations omitted); *Id.* ¶ 106(h).

Based on the holding in *Fama, supra,* that an agent's expert opinion that drug traffickers typically maintain "large amounts of cash, drugs, books, ledgers, and other documents evidencing their criminal activities ... should be considered a factor contributing to objective good faith," and because the challenged search warrant authorized the executing agents to search not only for quantities of cocaine, but also for "books, notes, ledgers, and other documents and records which is evidence, fruits and instrumentalities of the manufacture and distribution of cocaine" at Mullen's residence, place of business ("Rich–Po Enterprises") at 1202 E. Delavan Avenue, Buffalo, New York, the court finds the absence of any specific information connecting suspected drugs to Mullen's residence at 90 Sussex in Buffalo, New York, or Mullen's place of business, in the agent's supporting affidavit does not invalidate the search warrant. *See Fama,* 758 F.2d at 838. This judicial officer thus properly inferred, relying on Kaspyzyk's experience as stated in the affidavit, that based on Mullen's status as a leader of the large-scale and on-going narcotics conspiracy, as charged by the Indictment, Mullen's residence would yield evidence of narcotics trafficking. *Fama,* 758 F.2d at 838 (court considered opinion of agent employed by the DEA for 10 years that "major drug traffickers frequently maintain at their homes large amounts of cash, drugs, books, ledgers and other documents evidencing their criminal activities" a factor contributing to "objective good faith"); *United States v. Dillon,* 810 F.Supp. 57, 62 (W.D.N.Y.1992) (court found evidence uncovered by canine sniff in Buffalo airport and magistrate judge's reliance on Buffalo police officer's six-year experience as a DEA agent reasonable to support probable cause determination underlying warrant application for Defendant's residence). As *Fama* supports issuance of the search warrant directed to a narcotics trafficker's

---

**21.** Bracketed material added.

home, Mullen's motion directed to the search of his residence must fail.

Irrespective of the fact that Agent Kasprzyk also candidly admitted that information did not indicate that narcotics or other related contraband and evidence were located at Mullen's business or in his vehicle, given that the investigation revealed Mullen's narcotics distribution ring remained in operation when the warrants were obtained, it was a reasonable and common sense inference to believe that as the conspiracy's leader, Mullen's business and auto, like Mullen's residence, would also contain such evidence. It was therefore not illogical or unreasonable for the issuing magistrate judge to infer that such evidence of the charged offenses would be located in either Mullen's residence or business establishment, which investigators believed was a front for the conspiracy, or Mullen's vehicle which investigators knew Mullen relied on for transportation. According to the initial Indictment, filed July 27, 2004, the Grand Jury found Mullen's drug conspiracy was in operation up to that date, the day the warrants were issued. Doc. No. 1 at 2.

Accordingly, the absence of any specific information more conclusively suggesting that contraband or evidence of Mullen's narcotics trafficking was located at Mullen's E. Delevan place of "business" or his vehicle, as of August 2, 2004 the date the warrants were issued based on the first Indictment, does not require suppression. *United States v. Gaskin,* 364 F.3d 438, 456–57 (2d Cir.2004) (Fourth Amendment's requirement of a "fair probability" that evidence of crime exists necessary to support issuance of a warrant may be established based on experience and evaluation of facts by trained police officer), *cert. denied,* 544 U.S. 990, 125 S.Ct. 1878, 161 L.Ed.2d 751 (2005). It was reasonable to infer that if the conspiracy was, according

to the Grand Jury, in operating as to July 27, 2004, evidence of such operation fact would continue to be in Mullen's possession as of August 2, 2004.

As discussed, *Discussion, supra,* at 236–40, 241–45, 245–49, the court has found that the Intercept Orders were properly issued. This determination thus extinguishes Mullen's contention that because the affidavit by Agent Kasprzyk, supporting the search warrants, contains information from the wiretaps which Defendant argues is the fruit of an illegal search, suppression of all search warrants relying on such information is required. Eoannou Affirmation ¶¶ 100, 102–104.

As noted, the Supreme Court has established the "totality of the circumstances" test for the determination of probable cause under the Fourth Amendment with regard to a search warrant. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* Further, resolution of marginal cases should be determined by the preference afforded to warrants. *United States v. Smith,* 9 F.3d 1007, 1012 (2d. Cir.1993).

A 162–page affidavit provided by Special Agent Kasprzyk ("Kasprzyk Affidavit") which included the incriminating communications intercepted pursuant to the Intercept Orders was submitted in support of the search warrants challenged by Mullen. The Kasprzyk affidavit, which is based, in part, on information provided by Frederick Nolley and the informants CS–1, CS–2, CS–3, and CS–4, provides numerous details of the charged narcotics trafficking

conspiracy. Kasprzyk Affidavit ¶¶ 4–43. The court thus finds that, under the totality of the circumstances standard enunciated by *Gates, supra,* the warrants issued against Mullen were based upon probable cause. As discussed, *supra,* pursuant to the *Fama* case, a reasonable nexus between the narcotics conspiracy, as charged in the Indictment, and Mullen's residence was also established. Further, a trained and experienced narcotics investigator's evaluation of the facts of the instant investigation, particularly in light of the initial indictment returned on July 24, 2004, established probable cause to search on August 2, 2004 Mullen's business location and vehicle. *Gaskin, supra.* As such, Defendant Mullen's motion to suppress on this ground should be DENIED.

### B. Defendant Palmer's challenge to evidence obtained pursuant to the search warrant executed for 475 Shirley Avenue

██ Defendant Palmer argues that there is no substantial basis to believe the evidence sought from 475 Shirley Avenue would be found there when the premises were finally searched because, as Palmer argues, the search warrant was based on intercepted conversations which occurred more than four months earlier, and therefore the information was too stale to support the requested search warrant. Palmer Motion ¶¶ 18–25.

As discussed, Discussion, *supra,* at 251–52, in connection with Mullen's attack on the search warrant for his residence, the warrants sought in this case authorized the executing agents to search for "books and records" in addition to cocaine and narcotics and were properly issued pursuant to *Fama, supra.* In *United States v. Feola, supra,* the court held that search warrants issued for "books and records" of a criminal enterprise "remain fresh for probable

cause purposes for years." *Feola,* 651 F.Supp. at 1090–91. Also, "when the supporting facts 'present a picture of continuing conduct or an ongoing activity, . . . the passage of time between the last described act and the presentation of the application becomes less significant.'" *United States v. Ortiz,* 143 F.3d 728, 732 (2d Cir.) (quoting *United States v. Martino,* 664 F.2d 860, 867 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982)), *cert. denied,* 525 U.S. 910, 119 S.Ct. 252, 142 L.Ed.2d 207 (1998). "Indeed, narcotics conspiracies are the very paradigm of the continuing enterprises for which the court have relaxed the temporal requirements of non-staleness." *Ortiz, supra,* at 733 (internal quotation omitted). Informants' statements given two years before the issuance of a wiretap warrant in a narcotics conspiracy have withstood a staleness challenge given the likely continuous nature of the conspiracy. *Rowell, supra,* at 903.

In the instant case, the information derived from evidence obtained through the electronic Intercept Orders pertinent to Defendant Palmer was approximately four months old when presented by Agent Kasprzyk in support of the search warrant. Palmer Motion ¶¶ 18–25. The court finds such information was temporally probative of the alleged conspiracy, and was significantly more current than the information supporting the wiretap warrant sustained in *Rowell, supra.* Accordingly, Palmer's motion to suppress on this ground should be DENIED.

### C. Defendant Adams's challenge to evidence obtained pursuant to the search warrant executed for 928 Humboldt Parkway, Upper

Defendant Adams contends that the application for the warrant to search 928 Humboldt Parkway, upper, does not "re-

flect any factual allegations which reflect why the confidential informants were reliable." LaTona Affidavit ¶ 87. Further, Adams argues that the application fails to state whether any physical surveillance of the property was conducted or whether "any informant or data indicated that any contraband was at the premises." *Id.* Finally, Adams alleges the information from the conversations intercepted on February 24, 2004, April 8, 2004 and May 9, 2004, do not provide probable cause to believe contraband would be located on the premises, and further, that the conversations were stale by August 2, 2004, the date the search warrant was executed. LaTona Affidavit ¶¶ 87–91. Defendant Adams offers no authority in support of this latter contention.

Contrary to Adams's contention, the court, in addressing Defendant Palmer's motion to suppress based upon a defective search warrant, *Discussion, supra,* at 254–55, has determined that the information derived from evidence obtained through electronic intercept orders that is less than two years old when applying for a search warrant which concerns a large-scale narcotics conspiracy, like the instant case, is not stale. As such, Defendant Adams's motion to suppress on this ground should be DENIED.

Notwithstanding the staleness issue, Adams also alleges that the application for the warrant to search 928 Humboldt Parkway, upper, Adams's residence, does not provide a basis upon which the reliability of the confidential informants may be determined and fails to state whether any surveillance of the property was conducted. LaTona Affidavit ¶ 87. A plain reading of Agent Kasprzyk's affidavit in support of the search warrant demonstrates the contrary.

In his affidavit, Agent Kasprzyk states that information received from Nolley, CS–1, CS–3 and CS–4 has been reliable and accurate because it was "corroborated by independent sources of information" where possible, and because these informants have made numerous admissions against penal interest in providing this information. Kasprzyk Affidavit ¶¶ 4, 15, 34, 38. Moreover, despite any questions going to the reliability of CS–2, the information upon which the DEA investigators based their determination that Adams resided at 928 Humboldt Parkway, upper, was based on a combination of facts, including "wire intercepts, telephone subscriber records, utility checks, information from confidential informants and physical surveillance." Kasprzyk Affidavit ¶ 69. Therefore, even if these confidential informants were proven to be unreliable, it would not necessarily defeat a finding of probable cause regarding Adams's residence that was based on a combination of facts, as is the case here. Thus, Adams's motion to suppress on this ground should be DENIED.

Finally, Adams claims that no informant or data indicated contraband was at Adams's residence. LaTona Affidavit ¶ 87. As stated, Discussion, *supra,* at 251–52, Agent Kasprzyk acknowledged in his affidavit that he had "no specific information" connecting the drugs to the residences described in the warrant applications. Kasprzyk Affidavit ¶ 106. Notwithstanding, Agent Kasprzyk further explained that based on his experience and participation in narcotics investigation, dealers involved in narcotics trafficking typically keep narcotics and drug-related items where they reside relying on *United States v. Fama, supra. Id.* ¶ 106(a)-(g). The court has previously found the absence of informant information or data specifically indicating that contraband is presently at the premises is not determinative of the validity of the search warrant. Discussion, *supra* at 252–53. Instead, the agent's experience in

investigating narcotics conspiracies is sufficient to establish probable cause for issuing a search warrant to seize a narcotics trafficker's books and records likely to be located at the trafficker's residence. Kasprzyk Affidavit ¶ 106(h). As such, the agent's reliance upon *Fama, supra,* was reasonable. Therefore, any lack of evidence in the Agent's affidavit that contraband was actually at Adams's residence does not require suppression.

Accordingly, Defendant Adams's motion to suppress on this ground should be DENIED.

### D. *Defendant Terry Mullen's challenge to evidence obtained pursuant to the search warrant executed for 90 Sussex Street, Lower*

Defendant Terry Mullen contends that agents who searched the lower apartment at 90 Sussex Street in Buffalo, New York on August 3, 2004 did not represent they had a search warrant authorizing them to do so, but that if agents did possess a search warrant for the premises, it was not based upon probable cause, and failed to particularly describe the premises to be searched. LaMendola Affidavit ¶¶ 44–48. A careful review of Defendant's papers provides no support for these generalized contentions. To the contrary, the record establishes that the agents did obtain a federal search warrant for the premises on August 2, 2004. Government's Response, Exhibit 14. Additionally, the warrant specifically identified the property to be seized in a Schedule of Items to be Seized, attached as an exhibit to the warrant application. Kasprzyk Affidavit Exhibit B. Among the items listed are controlled substances, such as cocaine, cocaine base and heroin, financial records relative to the purchase and distribution of narcotics, safe deposit box keys, paraphenalia for cutting, weighing and distributing narcotics, and indicia of ownership or occupancy of the premises to be searched. *Id.* Significantly, Terry Mullen does not allege that he made a request to examine the search warrant which was refused by the executing agents. *See* Fed.R.Crim.P. 41(f)(3)(A) (executing officer must provide copy of the warrant and receipt of seized property to person whose property items were seized). Even if the agents failed to provide Mullen with a copy of the warrant, failure to comply with these warrant execution requirements are ministerial violations and absent a showing of prejudice to the accused or the agent's deliberate disregard of rule, suppression is not an available remedy. *United States v. Amendola,* 558 F.2d 1043, 1045 (2d Cir.1977) (citing cases) (decided under former Fed.R.Crim.P. 41(d)). Mullen makes no attempt to demonstrate such prejudice or abusive conduct by the executing agents. As such, the violations asserted by Mullen, if they occurred, are ministerial in nature, and do not warrant suppression. In its discussion of challenges to particular search warrants interposed by other Defendants, the court has determined the search warrants were based upon probable cause, citing *Fama* as authority for the "books and records" portion of the warrant directed to Mullen's residence, and by finding several of the informants, including Frederick Nolley, to be reliable. Discussion, *supra,* at 239–40, 251–56.

Accordingly, Defendant Terry Mullen's motion to suppress on this ground should be DENIED.

### E. *Evidence Obtained Pursuant to a Vehicle Stop and Subsequent Warrantless Search in Kansas in March, 2003*

Defendants Richard Mullen and Stranc move to suppress evidence seized from the warrantless search of a rental vehicle De-

fendant Stranc was driving in Kansas on March 4, 2003. The Government contends that Stranc is the only person with standing to challenge this search, and that the vehicle was properly stopped in Thomas County, Kansas, and that Stranc consented to the search. Government's Response at 59–63. At oral argument on the instant motion, Mullen acknowledged he does not have standing to move to suppress evidence resulting from this vehicle stop. Docket Item No. 252. As such, the court DISMISSED Mullen's motion to suppress on this ground as moot. Defendant Stranc pleaded guilty on December 16, 2005; accordingly, his motion is deemed withdrawn and the question of the search of Stranc's car in Kansas does not require adjudication.

## V. *Suppression of Defendants Funderburk's and Palmer's Statement*

Defendants Funderburk and Palmer move to suppress statements they made to authorities after being arrested. Specifically, Defendant Funderburk alleges that he may not have been advised of his *Miranda* rights when he made statements to the law enforcement agents on August 3, 2004 at his residence. Funderburk Motion ¶¶ 5–6. As such, Funderburk requests notice of intention from counsel to use such statements and a full description of the circumstances in which these statements were made. Additionally, Funderburk moves to suppress statements taken in violation of his Fifth Amendment rights, or requests a hearing in the alternative. Defendant Palmer contends he gave a statement under duress which detailed his own drug activities but had no connection to the narcotics conspiracy at issue. Specifically, Palmer alleges that Government

agents threatened to arrest his wife, which would result in his children being placed in foster care. Palmer Motion ¶ 26. Accordingly, Palmer moves to suppress his statement and requests a hearing into the circumstances surrounding the taking of his statement.[22] Palmer Motion ¶¶ 26–28.

The Government maintains that Palmer and Funderburk "were properly advised of the Miranda warnings and indicated that they understood those rights." Government Response at 64. The Government further asserts it was after they were advised of their rights that they made statements to police, but agrees that "an evidentiary hearing may be in order to establish the facts surrounding the arrests [sic] of each defendant and giving of statements that followed." *Id.* Finally, the Government denies that police threatened Palmer's wife. *Id.* An evidentiary hearing on Funderburk's motion was conducted before the undersigned on December 12 and December 19, 2005. Docket Item Nos. 284, 288. A briefing schedule was established, and the court reserved decision. A further Report and Recommendation directed to Funderburk's motion seeking suppression of his post-arrest statement will be submitted following the filing of the transcript of the hearing and the parties' briefs in accordance with such schedule. An evidentiary hearing on Palmer's motion is scheduled for March 9, 2006; however, as noted, Palmer is now scheduled to plead. Accordingly, Palmer's motion is deemed conditionally withdrawn without prejudice, based on his anticipated plea.

## VI. *Motion to Dismiss Count 2 of the Indictment*

■ Defendant Pressley moves to dismiss Count 2 of the Indictment against

---

**22.** Palmer is scheduled to plead before the undersigned on March 9, 2006. Docket Item No. 296. Should the plea not take place, the

Government is directed to schedule further proceedings on Palmer's motion.

him. Specifically, Defendant Pressley contends that Count 2 of the Indictment must be dismissed for lack of sufficiency. Pressley Motion at 3. The Government opposes Defendant Pressley's motion, arguing "an indictment is no longer required to be technically perfect, and will not be dismissed if the defect within it does not prejudice the defendant," citing *Smith v. United States,* 360 U.S. 1, 9, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959). Government Response at 65. The Government further contends that an indictment is valid if it offers "a plain, concise and definite written statement of the essential facts constituting the offense charged." Government's Response at 65 (citing Fed.R.Crim.P. 7(c)(1)).

As noted, Defendant Pressley is charged in Count 2 with knowingly, willfully and unlawfully conspiring with others to possess, with intent to distribute, five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 21 U.S.C. § 846 (" § 846"). The form of an indictment is governed by Fed.R.Crim.P. 7(c)(1) which provides that "the indictment ... shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged." *United States v. Macklin,* 927 F.2d 1272, 1276 (2d Cir.), *cert. denied,* 502 U.S. 847, 112 S.Ct. 146, 116 L.Ed.2d 112 (1991). To satisfy this standard, "[t]he facts alleged must be adequate to permit a defendant to plead former jeopardy upon prosecution. The indictment must also be sufficiently specific to enable the defendant to prepare a defense." *United States v. Carrier,* 672 F.2d 300, 303 (2d Cir.1982), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982). These principles have been held to apply to a conspiracy charged under 21 U.S.C. § 846. *Macklin, supra,* at 1276. Further, the Supreme Court has held that an indictment returned by a federal grand jury may not be challenged on

the ground that it is supported by inadequate or incompetent evidence. *United States v. Williams,* 504 U.S. 36, 54, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992).

An indictment under § 846 "need only allege the existence of a narcotics conspiracy, a relevant time frame, and the statute alleged to be violated." *Macklin, supra* (citing *United States v. Bermudez,* 526 F.2d 89, 94 (2d Cir.1975), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976)). Moreover, an indictment alleging a conspiracy under § 846 need not allege specific overt acts in furtherance of the conspiracy, as the conspiracy to distribute narcotics is itself a specific crime. *Bermudez, supra,* at 95.

Here, the Indictment alleges that Defendants, including Defendant Pressley, participated in the charged cocaine trafficking conspiracy between September 2001 and on or about August 3, 2004, in violation of § 846 (Docket Item No. 116 at 3). Accordingly, the Indictment sufficiently charges Pressley with participating in a narcotics trafficking conspiracy. Based on the foregoing, Defendant Pressley's motion to dismiss Count 2 of the Indictment should be DENIED.

### VII. *Hargrave's Motion to Dismiss the Indictment*

■ As stated in the Decision and Order issued contemporaneously with this Report and Recommendation ("Decision and Order"), Defendant Hargrave moved the court to review *in camera* minutes from the Grand Jury or to dismiss the Indictment, arguing that the testifying agent's reference in the affidavit in support of the Complaint to a conversation which allegedly took place between Defendants Richard Mullen and Hargrave on June 22, 2004 ("the 26–5 conversation") was taken out of context so as to have

"deliberately distorted the true meaning of the words spoken to provide at least the semblance of probable cause." Defendant Hargrave's Memorandum of Law at 2 (Docket Item No. 153) ("Hargrave Memorandum"). In the Decision and Order, the court determined it would not, as Hargrave requested, require an *in camera* inspection of the relevant Grand Jury testimony pertaining to the conversation at issue, because, even assuming the agent testified as posited by Hargrave, "where subsequent events merely cast doubt on the credibility of grand jury witnesses, due process does not require the prosecution to notify the grand jury of those events and seek a new indictment." *United States v. Guillette*, 547 F.2d 743, 753 (2d Cir.1976), *cert. denied*, 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977). Decision and Order at 24.

For the purposes of the instant motion, the court considers it possible, assuming the agent in fact testified as Hargrave argues, that the agent failed in his testimony to describe the entirety of the 26–5 intercepted conversation, a supposition formed by Hargrave after review of the pertinent wiretap transcript, showing the entirety of the 26–5 conversation. However, the court also finds the face of such arguably incomplete, and thus potentially misleading, testimony to be a "subsequent event" within the holding of *Guillette*. Importantly, Hargrave does not allege that the testifying agent committed perjury or that the Government condoned or relied on any intentional misrepresentation of the intercepted conversation by the agent in seeking the Indictment against Hargrave. *See Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir.2003) (presumption that an indictment is supported by probable cause can be rebutted by alleging it was obtained by "fraud, perjury, the suppression of evidence or other bad faith police conduct"); *United States v. Schwartz*, 464 F.2d 499,

511 (2d Cir.) ("As long as there is some competent evidence to sustain the charge issued by the Grand Jury, an indictment should not be dismissed"), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972).

Absent any reason to believe the Government solicited or knowingly condoned perjured testimony by the agent in connection with the testimony at issue, there is no basis to dismiss the Indictment as to Hargrave. In *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), where IRS agents provided "misleading and inaccurate summaries" to the grand jury, the Supreme Court determined there was nevertheless insufficient grounds to dismiss the indictment as there was no evidence of prosecutorial misconduct as to such misleading and inaccurate evidence. *Bank of Nova Scotia*, 487 U.S. at 260–61, 108 S.Ct. 2369. *See also United States v. Strouse*, 286 F.3d 767, 774–75 (2002) ("What the *Williams* Court's reliance on *Nova Scotia* makes clear, then, is that the misconduct that amounts to a violation of one of those few clear rules [justifying possible dismissal] ... must involve government misconduct") (bracketed material added). Thus, standing alone, misleading testimony by a federal agent before a federal grand jury, does not warrant dismissal as a sanction.

As the court noted in the Decision and Order, even assuming, *arguendo*, that the agent misled the Grand Jury, as Hargrave implies, deliberately or inadvertently, into indicting Hargrave by presenting an incomplete portion of the 26–5 conversation as evidence of Hargrave's involvement in the Mullen narcotics conspiracy (which involvement may not arguably have been inferred if the Grand Jury had reviewed the entire 26–5 conversation), no evidence is submitted by Hargrave even suggesting the Government knew of the misleading

nature of such testimony, or that the Government should have determined that the agent's assessment that the conversation related to drugs could not be based on his experience with narcotics trafficking conversations, but was instead a purposeful attempt to mislead the Grand Jury.[23]

Hargrave has therefore failed to support any finding that the Government was complicit in misconduct, including perjury or wilful misleading of the Grand Jury, sufficient to support dismissal. Moreover, significantly, at oral argument, the Government represented that other evidence before the Grand Jury implicated Hargrave in the conspiracy as charged in Count 2 of the Indictment. As such, Defendant Hargrave's motion to dismiss the Indictment should be DENIED.

## VIII. *Edmond's Motion to Dismiss the Indictment*

■ Defendant Edmond moves to dismiss the Indictment as against her. Edmond Attorney Affirmation ¶¶ 7–8. Edmond claims her conversations do not appear on any wiretap evidence, and that the only evidence the Government has against her is "the fact that she apparently rented some vehicles for one or more of the co-defendants [e.g., Stranc] and she apparently took some trips with the lead defendant, Richard Mullen." *Id.* at 7 (bracketed material added). The Government does not address this issue.

It is well-established that the grand jury exists not to determine guilt or innocence, but to assess whether there is an adequate basis for bringing a criminal charge.

*Branzburg v. Hayes,* 408 U.S. 665, 686–87, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). As such, "[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." *Costello v. United States,* 350 U.S. 359, 364, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (declining to enforce the hearsay rule in grand jury proceedings as to do so "would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules"). Moreover, "unsupported suspicions of grand jury abuse by the prosecution did not justify disturbing the secrecy of the grand jury's proceedings." *United States v. Ullah,* 2005 WL 629487 * 14 (W.D.N.Y.2005).

"A grand jury is neither an officer nor an agent of the United States, but a part of the court." *Falter v. United States,* 23 F.2d 420, 425 (2d Cir.), *cert. denied,* 277 U.S. 590, 48 S.Ct. 528, 72 L.Ed. 1003 (1928). Further, to ensure a grand jury's independence, a district court has limited supervisory authority over the grand jury. *United States v. Williams,* 504 U.S. 36, 46–47, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). As a result, any power which a federal court may have over a grand jury is highly circumscribed, not "remotely comparable" to the power which state courts maintain over their own grand jury proceedings. *Williams, supra,* at 50, 112 S.Ct. 1735. In *Williams,* the Supreme

---

**23.** As a result of voluntary discovery of the relevant Title III orders and related documents following arraignments on the initial Indictment and the Fed.R.Crim.P. 5 proceedings on the Complaint which named Hargrave, it is conceivable that the Government attorney could have become aware of the incomplete nature of the 26–5 conversation if presented to the Grand Jury as Hargrave has suggested and failed to take steps to obviate the potential prejudice to Hargrave prior to the return of the Superseding Indictment, adding Hargrave to the Conspiracy Count, in January 2005. However, Hargrave makes no such argument.

Court went beyond *Costello, supra*, holding that a challenge to the sufficiency of a federal grand jury's evidence, recast as a claim that the prosecutor's presentation was incomplete or misleading, is inadequate to require dismissal of an indictment. *Williams, supra*, at 54, 112 S.Ct. 1735.

Essentially, Defendant Edmond seeks to litigate her culpability, or lack thereof, on pretrial motion to dismiss the Indictment; however, such pretrial determinations may not be obtained in a federal criminal prosecution. *See Costello, supra*. Defendant Edmonds will have an opportunity at trial to test the evidence presented against her which allegedly links her to the conspiracy sufficient for a finding of guilty under Count 2. As such, Defendant Edmonds' motion to dismiss the Indictment as against her should be DENIED.

## IX. *Motion to Exclude Post–Arrest Statements Made by Non–Testifying Co–Conspirators*

Defendants Pressley and Funderburk move to exclude from evidence any post-arrest statements made by non-testifying co-conspirators which would implicate either Defendant. Funderburk's Motion at 3; Pressley's Motion at 17–18. In support, Defendants rely upon *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), *appeal after remand*, 416 F.2d 310 (8th Cir.1969), *cert. denied*, 397 U.S. 1014, 90 S.Ct. 1248, 25 L.Ed.2d 428 (1970), where the Supreme Court found that a non-testifying co-defendant's confession that was admitted at a joint criminal trial which "facially incriminated" the defendant violated the defendant's Sixth Amendment right to confront adverse witnesses. Funderburk's Motion at 4; Pressley's Motion at 18. The Government has not stated whether it plans to introduce such statements at trial, nor has

it provided such statements to the Defendants. Further, the Government has not in its Response or at Oral Argument, specifically opposed Pressley's and Funderburk's motions to exclude, under *Bruton*, post-arrest statements made by non-testifying co-conspirators.

"The Second Circuit has held that a defendant's Bruton rights [are] violated . . . only if the statement, standing alone, would clearly inculpate him without introduction of further independent evidence." *Comfort v. Kelly*, 1998 WL 384613 (W.D.N.Y.1998) (internal quotation marks omitted) (quoting *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir.1985), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985)). Further, the Supreme Court in *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), refused to apply *Bruton* to a non-testifying co-defendant's confession submitted with a proper limiting instruction by the court so long as "the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson*, 481 U.S. at 211, 107 S.Ct. 1702. However, where redacted confessions "facially incriminat[ed]" the defendant and "involve[d] inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial," the redacted confession violates a Defendant's Sixth Amendment rights. *United States v. Sanin*, 252 F.3d 79, 84 (2d Cir.2001) (quoting *Gray v. Maryland*, 523 U.S. 185, 197, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998) (where government witness used the word "deleted" in place of blank spaces and, after reading the confession to the jury, informed them that he arrested defendant upon receipt of the co-defendant's statement)), *cert. denied*, 534 U.S. 1008, 122 S.Ct. 492, 151 L.Ed.2d 403 (2001).

Based on the applicable caselaw, the absence of any indication that the Government intends to use statements arguably subject to *Bruton* and absent a well-grounded proffer by Defendants that a nontestifying defendant's confession, if introduced, will be the sole inculpatory evidence offered against them, Defendants Pressley's and Funderburk's motions are DISMISSED without prejudice to renewal at trial should the Government attempt to introduce statements subject to *Bruton's* requirements.

## X. Defendant Pressley's Motion to Exclude Testimonial Hearsay

■ Defendant Pressley moves to exclude testimonial hearsay from evidence at trial, arguing that such evidence is barred by *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) as violative of the Sixth Amendment. Pressley Motion Part XIV. Pressley contends testimonial hearsay which is barred includes hearsay from nontestifying "witness[es]," "target[s]," or "co-defendant[s]."[24] Pressley Motion Part XIV. The Government does not respond to Defendant Pressley's request.

In *Crawford,* the Supreme Court modified the holding in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which allowed hearsay evidence if it qualified as an exception to the hearsay rule or if it had "particularized guarantees of trustworthiness." *Crawford v. Washington,* 541 U.S. 36, 60, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Instead, the Court established a bright-line rule that "prior testimonial statements ... are never admissible against a defendant unless he had an opportunity to cross-examine [the] declarant, regardless of whether the out-of-court statement falls within a firmly rooted hearsay exception or has particularized guarantees of trustworthiness."[25] *Haymon v. New York,* 332 F.Supp.2d 550, 556 (W.D.N.Y.2004) (citing *Crawford, supra,* at 40, 124 S.Ct. 1354). In *Crawford,* the Supreme Court did not specifically define the term "testimonial statement." *Id.* at 557. However, the Court in *Crawford* identified as "testimonial" statements "prior testimony at a preliminary hearing, previous trial, or grand jury proceeding, as well as responses made during police interrogations." *Id.; see also Crawford, supra,* at 68, 124 S.Ct. 1354. Additionally, a declarant's "recorded statement, knowingly given in response to structured police questioning" will be considered testimonial. *Haymon, supra,* at 557.

As neither the Government nor Pressley has proffered any statement the Government intends to use at trial which may be subject to *Crawford,* the court finds Pressley's motion premature. Moreover, it cannot be disputed that incriminating statements made by co-conspirators in furtherance of the conspiracy, admissible as exceptions to the hearsay rule, are therefore not presently considered to be within the prohibition as "prior testimonial statements," to the extent established by *Crawford. Crawford, supra,* at 51, 124 S.Ct. 1354; *Haymon* at 557. Accordingly, Pressley's motion is DISMISSED without prejudice to renewal at or prior to trial before the District Judge should the Government attempt to introduce evidence subject to *Crawford's* holding as part of its case-in-chief.

### CONCLUSION

Defendants' motions should be DENIED in part, and DISMISSED as moot in part.

---

**24.** Bracketed material added.

**25.** Bracketed material added.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Government and the Defendants.

SO ORDERED.

Feb. 24, 2006.

## AMENDED REPORT and RECOMMENDATION

### JURISDICTION

This case was referred to the undersigned by the Hon. Richard J. Arcara on October 19, 2005 for all pretrial matters. The matter is presently before the court on Defendant's motion to suppress filed July 15, 2005. (Docket Item No. 189).

### BACKGROUND

On July 29, 2004, Richard Mullen and six others were initially charged in a five count indictment with violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 843(b),

846 ("the Conspiracy Count"), 848(a), and 18 U.S.C. § 2. On August 2, 2004, Defendant Funderburk ("Defendant" or "Funderburk") was charged in a separate complaint ("the Complaint") with violations of 21 U.S.C. § 843(b) (" § 843(b)"), using a communication facility to facilitate committing a drug felony. On August 3, 2004, approximately 34 individuals were arrested in connection with this conspiracy pursuant to a related criminal complaint.

In a superseding indictment, filed January 20, 2005, 27 persons were added as co-defendants under the Conspiracy Count. (Docket Item No. 52). In a Second Superseding Indictment, filed on April 28, 2005, Defendant was added to the Conspiracy Count. (Docket Item No. 116).

In accordance with the amended scheduling order, Defendant filed his omnibus motion on July 15, 2005 ("Defendant's Motion") (Docket Item No. 189). An evidentiary hearing on Defendant's motion was conducted before the undersigned on December 15, 2005 (Docket Item No. 284) and December 19, 2005 (Docket Item No. 288). Defendant's Memorandum of Law in Support of Defendant's motion was filed on June 2, 2006 ("Defendant's Memorandum") (Docket Item No. 417); the Government's Response to Defendant's motion was filed on June 26, 2004 ("Government's Response") (Docket Item No. 434). Defendant's Reply was filed on July 6, 2006 ("Defendant's Reply") (Docket Item No. 438). Oral argument was deemed unnecessary.

### FACTS[1]

On August 3, 2004, at approximately 5:30 a.m., United States Drug Enforcement Agency ("DEA") Group Supervisor Nancy Cote ("Agent Cote" or "Cote"), Special Agent Alexander Yasevich ("Agent

---

**1.** Taken from the pleadings and papers filed in this action.

Yasevich" or "Yasevich"), and three Buffalo Police officers arrived at Funderburk's residence to execute the warrant, issued on August 2, 2004, for Funderburk's arrest pursuant to the Complaint. TI 22–23; TII 4–5.[2] Funderburk and his wife responded to the agents' knocking at the front door and the officers' knocking at the side door by exiting the house. TI 23. At that point, Agent Cote informed Funderburk he was under arrest and handcuffed him. *Id.* One of the police officers asked Funderburk if he had weapons in the house; Funderburk replied he did, and the officers retrieved these weapons. *Id.* When Funderburk was told his arrest was based on communications with co-Defendant Frederick Nolley, Funderburk's brother-in-law, Funderburk yelled at his wife that he was in trouble because of her brother. TI 64–65; TII 48–49.

The agents placed Funderburk in the rear seat of Agent Cote's vehicle. TI 24. Yasevich was seated in the front passenger seat of the vehicle, which was driven by Cote. TI at 39, 24. Agent Yasevich then read Funderburk his *Miranda* warnings from a standard issue DEA Form 13A card at the beginning of the 10 to 15 minute drive from Funderburk's residence to the local DEA office located in downtown Buffalo. TI 24, 29, 33–34; TII 8–9. Yasevich orally read Funderburk's rights from the DEA Form 13A in a "normal conversational voice" facing forward, occasionally turning and looking at Funderburk, after reading each *Miranda* right to Funderburk, to ask whether Funderburk understood. TI 34–35, 75–76. According to Yasevich, Funderburk, though visibly upset over the arrest, responded by saying "yes" to each question, never indicating to Yasevich, who speaks with a slight Russian

accent, that Funderburk did not understand each of Yasevich's statements and questions. TI 34–35, 97. Further, during the ride, Funderburk repeatedly indicated to the agents that Funderburk wished to make a statement, but was instructed by the agents to defer speaking until Funderburk arrived at the DEA office. TI 34–37; TII 10–11, 14. No questions were posed to Funderburk during the car trip to the DEA office. TI 37.

At the DEA office, Funderburk was handcuffed by one hand to a chair in the interview room without Funderburk's objection. TI 40–41. Agent Yasevich testified that, for safety purposes, it was standard practice to handcuff a suspect while in custody. TI 40–41. At that point, Funderburk again informed the agents that he desired to make a statement, but was again told the agents first need to obtain Funderburk's "biographical/pedigree data" on DEA Form 202. TII 9–10. Funderburk was then asked if he wanted something to eat or drink, and Funderburk requested a bottled water which was provided to him. TI 43; TII 19.

Upon completion of the DEA Form 202, Cote asked Funderburk if he wished to give a statement regarding the investigation, to which Funderburk replied "yes." TII 14. Cote gave Funderburk the option of writing the statement himself, but Funderburk preferred to dictate it to Cote. TI 46–47, 93; TII 17. Funderburk would "dictate verbatim" what he wanted the statement to say, also advising Agent Cote how to spell some words. TII 17. Agent Cote wrote a paragraph at a time, after which Funderburk would look at the statement, read it over or have Agent Cote read back sentences, and make a minor changes. TI 46–47. Funderburk proceed-

---

**2.** References to "TI ——" are to the transcript of the hearing conducted before the undersigned on December 15, 2005. References to

"TII ——" are to the transcript of the hearing conducted December 19, 2005.

ed to revise the written statement and initial his changes. TI 46–47; TII 20–21. Funderburk signed the statement and Yasevich witnessed the statement by co-signing it. TI 46–47; TII 21. It took approximately 45 minutes to an hour to obtain, edit and sign Funderburk's written statement. TII 21. Funderburk never hesitated to respond to the agents' questions, nor did he request an attorney. TII 21–22. Cote asked Funderburk more than once if he wanted an attorney present; Funderburk said he did not. TI 41–42. No threats or promises were made in taking Funderburk's statement, however, no *Miranda* warnings were repeated to Funderburk at this time. TI 77, 81–82. Other than Funderburk, Agents Cote and Yasevich were the only persons in the room when Funderburk provided the statement. TI 46.

Once this interview had concluded and while Funderburk was being fingerprinted, Agent Cote discussed Funderburk's statement with Special DEA Agent Dale Kasprzyk ("Agent Kasprzyk" or "Kasprzyk") who told Cote that Funderburk's statement was, in several important respects, at odds with facts Kasprzyk knew to be true, particularly Funderburk's denial of any recent contact between Funderburk and Frederick Nolley. TII 24. Approximately 30–45 minutes after Funderburk's first statement was taken, Agents Kasprzyk and Cote spoke with Funderburk, who was then being held in a holding cell located within the DEA office, to confront him with the inconsistencies. TII 26, 29–30. Specifically, Agent Kasprzyk verbally contradicted Funderburk's assertion to Agent Cote that Funderburk had not seen Frederick Nolley in 20 years, stating to Funderburk the DEA observed Funderburk meeting with Nolley in a local city park approximately two months earlier. TII 30. Initially, Funderburk was unresponsive, but eventually admitted to meeting Nolley

in the park in June 2004, claiming to the agents that he met Nolley, because Nolley wanted Funderburk "to run" Nolley's driver's license to assure Nolley there was no problem with the license, which Funderburk did. TII 32. Funderburk also denied to the agents any knowledge that Nolley was an alleged drug-dealer, as the agents maintained, but admitted knowing Nolley had been shot on two prior occasions. TII 33. The conversation between Funderburk and the agents lasted between 10 and 15 minutes. TII 34.

## DISCUSSION

### A. Probable Cause to Arrest

Funderburk urges all of the statements at the time of and subsequent to his arrest must be suppressed because his arrest was without probable cause. Defendant's Memorandum at 4–8. At the outset, the Government argues that Funderburk's motion to suppress based on lack of probable cause is untimely because Funderburk failed to specifically raise this contention in his motion papers, as required by Fed. R.Crim.P. 12(e). Government's Response at 8. Perusal of Funderburk's motion papers reveals Funderburk did, in fact, fail to raise the argument that Agent Kasprzyk's affidavit, in support of the Complaint, did not establish probable cause for Funderburk's arrest and that suppression of Funderburk's statement should therefore be suppressed based on the fruit of the poisonous tree doctrine. (Doc. No. 189 at 3). However, as Funderburk correctly contends, the court, in its discretion at the hearing held on December 19, 2005 before the undersigned, invited defense counsel to "raise any issue … that the hearing and the pleadings support." TII 104. As such, the court finds Funderburk's argument that his arrest was without probable cause and that his subsequent incrimina-

ting statements made while in custody should be suppressed, is properly before the court.

Funderburk specifically contends that the four intercepted phone calls, described in Kasprzyk's affidavit in support of the Complaint, do not provide probable cause for Funderburk's arrest for violation of § 843(b) in that (1) the conversation between Defendant Richard Mullen and Frederick Nolley on June 3, 2004 in which Nolley attempted to convince Mullen, the leader of the alleged narcotics ring, that Funderburk will not hinder their narcotics distribution activities, is insufficient to suggest any inference of Funderburk's criminality; (2) the telephone call, also referenced in Kasprzyk's affidavit, between someone known as "Moo" and Nolley regarding when cocaine would be available from Nolley fails to connect Funderburk to Nolley's narcotics activity; and (3) the apparent purpose of the two telephone calls between Nolley and Funderburk on July 21, 2004 was to innocently inquire of Funderburk how Nolley should assure, in the event Nolley was stopped while driving by local police, that Nolley's driver's license was valid, and how, as an African–American driver, to avoid unwanted police interference while driving. Defendant's Memorandum at 4–6. Funderburk further contends that nothing in Kasprzyk's affidavit directly demonstrates Funderburk's knowledge that Nolley was a drug dealer showing that Funderburk's actions were innocent in nature. *Id.* at 6. Finally, Funderburk asserts the "good faith exception" to the Exclusionary Rule should not apply in this case because, "the application [for the warrant] is so lacking in indicia of probable cause as to render reliance upon it unreasonable." *Id.* at 3.

In opposition, the Government contends there was adequate probable cause to support the Complaint and arrest warrant for Funderburk and therefore Funderburk's statement could not be the result of any initial illegality, a prerequisite to application of the fruit of the poisonous tree doctrine. Government's Response at 8–12. Specifically, the Government argues (1) the intercepted conversations between Nolley and Funderburk, in which Funderburk advised Nolley how to operate Nolley's vehicle to avoid attention by law enforcement, makes direct reference to an earlier car stop of another local drug trafficker and the trafficker's loss of $1.5 million of cocaine; (2) Funderburk's intercepted comment to Nolley that "I don't know if you know that dude" implies fairly Funderburk was aware that, like the "dude" who lost the cocaine as referred to by Funderburk, Nolley also was a drug dealer; (3) based on Agent Kasprzyk's training, it was reasonable for Kasprzyk, the affiant, to believe Funderburk, as an experienced police officer and possessed of knowledge of local drug trafficking activity, was attempting to coach Nolley on how to successfully "mule" drugs in the city; and (4) the "good faith" exception to the Exclusionary Rule applies to both arrest and search warrants, and such exception supersedes the fruit of the poisonous tree doctrine, upon which Funderburk relies. Government's Response at 8–12.

 First, there is no merit to Funderburk's contention that his arrest, based on the Complaint and supporting affidavit of Agent Kasprzyk, lacked probable cause. The Fourth Amendment protects against unreasonable searches and seizures and requires probable cause to the issuance of warrants, including an arrest warrant. *Groh v. Ramirez*, 540 U.S. 551, 557, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004). Generally, probable cause exists "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in them-

selves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir.1983) (internal citations omitted).

█ Here, Funderburk's arrest was amply supported by probable cause established in the affidavit in support of the Complaint upon which Funderburk's arrest warrant was based. Although it is arguable that, standing alone, the phone calls between Nolley and Mullen on June 3, 2004 and Nolley and "Moo" on July 21, 2004 establishing Nolley's status as an active narcotics trafficker, do not demonstrate probable cause for Funderburk's arrest warrant, taken together with the two intercepted phone calls between Funderburk and Nolley on July 21, 2004, probable cause to believe Funderburk was using a telephone to facilitate such trafficking was manifestly presented. For example, in his conversation advising Nolley regarding how to drive so as to avoid a traffic stop by police, Funderburk refers to the arrest of a high profile drug dealer who had been recently stopped by local police. This reference reasonably suggests an awareness by Funderburk that Nolley's questions to him were for the purpose of assisting Nolley in safeguarding Nolley's drug trafficking activities, and not, as Funderburk contends, solely to seek innocent advice to Nolley on how best to avoid being stopped improperly by local police, even if, because of Nolley's race. Further, the court finds that by advising Nolley how to reduce the risk of attracting police attention while operating his car strongly implies Funderburk was attempting to use his experience and knowledge as a law enforcement "insider" to instruct Nolley on how to suc-

cessfully "mule" drugs, as the Government contends. Government's Response at 10.

If Funderburk's actual purpose was merely to advise Nolley on how African–American males can operate a vehicle without being unfairly stopped by police, common sense dictates Funderburk would have had no need to refer to a known narcotics trafficker who police had previously stopped (perhaps improperly) but were ultimately justified in arresting for narcotics trafficking. In the context of all the facts presented in Agent Kasprzyk's affidavit, it stretches credulity to conclude otherwise, as Funderburk urges. Moreover, the court finds Nolley's telephone request to Funderburk that Funderburk run a law enforcement records check on Nolley's license to determine its current validity as inconsistent with any innocent purpose. Significantly, Funderburk admits this request was made in an attempt to avoid "intrusive police conduct." Defendant's Memorandum at 5–6. However, if Nolley, who may be charged with awareness as to the status of his driver's license, had a valid license, Nolley would reasonably have had no need to verify such fact through Funderburk, a police officer. Nolley's peculiar concern with a potential traffic stop based on a license check taken together with Funderburk's apparent awareness of Nolley's narcotics activity also demonstrates probable cause to believe Funderburk was attempting to facilitate such narcotics activity. As such, the court finds the intercepted statements made by Funderburk to Nolley reasonably support that Funderburk had knowledge of Nolley's illegal drug-related activities, and that Funderburk was using the telephone in violation of 21 U.S.C. § 843(b) as the Complaint alleged.[3]

---

3. Funderburk states he requested surveillance reports from the Government "that may establish whether or not Nolley embarked [sic]

the journey speculated with such factual certainty by Agent Kasprzyk in ¶ 41," Defendant's Memorandum at 8, and acknowledges

Second, Funderburk's argument, that the "good faith exception" to the Exclusionary Rule is inapplicable because its application to this case is "is so lacking in indicia of probable cause as to render reliance upon it unreasonable," is equally without merit. Defendant's Memorandum at 3 (citing *United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). Rather, as stated, Discussion, *supra*, at 267, because Funderburk's telephonic advice to Nolley on July 21, 2004 supports a reasonable belief that Funderburk knew of Nolley's drug activity, there was a substantial indicia of probable cause in the affidavit supporting the Complaint and warrant.

Third, Funderburk's argument that his statement taken subsequent to his invalid arrest, must be suppressed as "fruit of the poisonous tree" if the court finds the warrant issued without probable cause, Defendant's Memorandum at 3–4, is moot as the court has determined that probable cause supports the arrest warrant. However, even assuming that Funderburk was arrested without probable cause, Funderburk's assertion that statements he made to DEA agents while in their custody must be suppressed pursuant to *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) nevertheless fails.

In *Dunaway, supra*, the Supreme Court suppressed a defendant's confession based on the deliberate exploitation by police of the accused's unlawful detention. *Dunaway*, 442 U.S. at 218–19, 99 S.Ct. 2248. Here, even if Funderburk's arrest lacked probable cause, because Funderburk was given his *Miranda* warnings shortly before making his statement and repeatedly requested of the arresting agents he be allowed to make a statement, it cannot be found that but for the unlawful arrest, as Funderburk asserts, Funderburk would not have freely given the statements at issue. This analysis applies equally to the subsequent statement given in response to the confrontation with Agent Kasprzyk that occurred within 45 minutes of Funderburk's statement to Agents Cote and Yasevich. Based on Funderburk's undisputed eagerness to cooperate, as demonstrated by the credible testimony of the agents in the record,[4] his custodial statements must be found to have resulted from Funderburk's spontaneous and desire to cooperate, rather than as the result of any actions by the agents to exploit on an unlawful arrest.

Funderburk's reliance on *Brown, supra*, is similarly misplaced. In *Brown*, unlike the instant case, the defendant was arrested "without probable cause and without a warrant." *Brown, supra*, at 591, 95 S.Ct.

that the Government's attorney indicated such reports do not exist. *Id.* Nevertheless, Funderburk requests production of any surveillance reports concerning Nolley from July 21, 2006 through August 2, 2006, which, based upon the time period when the phone calls at issue were intercepted, if they exist, according to Defendant would show a material omission of fact that defeats probable cause. Defendant's Memorandum at 8. AUSA Kane represented that no such reports exist. The court has no reason to doubt this representation, and as such, Defendant's request for production is DENIED. Defendant's request for a *Franks* hearing is similarly DE-

NIED, as the record does not establish there were any "inaccuracies or omissions" in the affidavit or that Agent Kasprzyk's allegations were "deliberate falsehood[s]" or based on a "reckless disregard for the truth" which would require such a hearing. *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir.1998), cert. denied, 526 U.S. 1028, 119 S.Ct. 1273, 143 L.Ed.2d 368 (1999); *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir.), cert. denied, 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985).

4. Funderburk did not testify.

2254. Although in *Brown* defendant had been given *Miranda* warnings, the Court held that *Miranda* warnings, standing alone, will not "purge the taint of an illegal arrest." *Brown, supra,* at 605, 95 S.Ct. 2254. Other factors, which include "the temporal proximity of the arrest and the confession, the presence of intervening circumstances, ... and, *particularly,* the purpose and flagrancy of the official misconduct" must be considered. *Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254 (internal citations omitted) (underlining added). "The voluntariness of the statement is a threshold requirement." *Id.*

Funderburk contends, pursuant to *Brown,* that his statements must be suppressed because there is a "causal connection between the illegality and the confession." Defendant's Memorandum at 4, 6–7. Specifically, Funderburk relies on the fact that his statements were given within two hours of his arrest, implying administration of *Miranda* warnings were insufficient to overcome the continuing taint flowing from his unlawful arrest in the taking of Funderburk's statement. Funderburk also argues that "the unreasonable reliance upon the warrant in light of the lack of probable cause to arrest speaks to the purpose and flagrancy of the official misconduct." Defendant's Memorandum at 7. The court disagrees.

Here, not only did Funderburk receive *Miranda* rights after he was arrested, but Funderburk repeatedly expressed to the agents his desire to cooperate and make a statement demonstrating that Funderburk's statement resulted primarily from such desire, an influence wholly independent of the arrest. TI 34–36; TII 14. Further, the agents' attempts to avoid misconduct are demonstrated by admonishing Funderburk not to make statements until their arrival at the DEA office and by their asking Funderburk several times

whether he wanted an attorney present, which Funderburk refused, and the deference the agents showed Funderburk in allowing him to dictate and make changes to his statement. Additionally, the time period between Funderburk's arrest and confession was relatively short, approximately two hours. Finally, it is not credible that an experienced police officer like Funderburk could not resist the interrogation even if he was aware he had been arrested illegally. In addition to the *Miranda* warnings that were given to Funderburk upon his arrest, these factors serve to attenuate, if not completely negate, any influence upon Funderburk because of any possible illegality stemming from an illegal arrest. Thus, even if Funderburk's arrest was without probable cause, Funderburk was given his *Miranda* warnings, was willing to provide a statement and cooperate, made such statement shortly after his arrest, was an experienced police officer familiar with his right to remain silent and to counsel, and was allowed to actively participate in making his statement. These facts render *Brown* and *Dunaway* completely inapposite.

**B. Waiver of Miranda Rights**

Funderburk also seeks to suppress his statements made to the agents after being read his *Miranda* warnings on the additional ground that he did not knowingly and voluntarily waive his *Miranda* rights. Defendant's Memorandum at 8–11. Specifically, Funderburk contends he was under extreme emotional distress when he purportedly waived his *Miranda* rights, and that these rights were read to him while traveling in Agent Cote's automobile to the DEA office in a manner which did not allow him to adequately hear them and make an adequate waiver. Defendant's Memorandum at 9. In opposition, the Government contends that Funderburk understood fully the *Miranda* warnings

read to him by Agent Yasevich in the car and, despite the fact that even if Funderburk may have been emotionally upset by his arrest, Funderburk was no more upset than the average person would be in the same situation. Government's Response at 15. The Government also relies on Funderburk's status as an experienced police officer demonstrating Funderburk's contention, that he did not properly waive his *Miranda* rights, is spurious. Government's Response at 15–16; *see also United States v. Gallo*, 2000 WL 852453 * 7 (D.Conn.2000) (defendant's "training and experience as a police officer" demonstrated his familiarity with *Miranda* rights); *United States v. DiLorenzo*, 1995 WL 366377 * 5 (S.D.N.Y.1995) (defendant's 9–year experience as a police officer made him "uniquely familiar" with *Miranda* rights).

It is basic that an accused may waive his *Miranda* rights. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Terry v. LeFevre*, 862 F.2d 409, 412 (2d Cir.1988). In making this determination, the court considers whether the purported waiver was voluntary and constituted "a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case including the background, experience and conduct of the accused." (internal quotation omitted). *Edwards*, 451 U.S. at 482, 101 S.Ct. 1880 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). "Thus, the determination whether statements obtained during custo-

dial interrogation are admissible is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." *Fare v. Michael C.*, 442 U.S. 707, 724–25, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

Considering the totality of the circumstances presented on this record, the court finds Funderburk knowingly and voluntarily waived his *Miranda* rights. Initially, the court observes it is undisputed that Funderburk had been a member of the Buffalo Police Department for at least six years prior to his arrest. *See* Government's Response at 15. As such, Funderburk's particular background and experience as a police officer demonstrates his familiarity with investigative situations where a suspect must be read *Miranda* rights and what those *Miranda* rights entail. Further, the court finds that, as discussed, Discussion, *supra*, at 263–64, even if Agent Yasevich was facing forward and in the front seat of Cote's car when, as the agent testified, he read each *Miranda* right to Funderburk from the standard DEA Form 13A, Funderburk never indicated to Yasevich that he could not hear or understand Yasevich, never asked Yasevich to speak louder or enunciate more clearly, and responded "yes" each time Yasevich turned in his seat to ask Funderburk if Funderburk understood the particular right that Yasevich just read to Funderburk. Thus, it is immaterial that Yasevich spoke with a slight, albeit, noticeable, foreign accent given that Funderburk never indicated to Yasevich he had difficulty understanding Yasevich.[5,6,7]

5. Funderburk does not contend that the DEA Form 13A inadequately states the admonitions required by *Miranda*.

6. Neither counsel nor the court had difficulty understanding Yasevich's testimony at the hearing.

7. Funderburk did not testify at the hearing in support of his motion.

Funderburk's contention that he did not voluntarily waive his *Miranda* rights because he was then suffering emotional distress following his arrest is equally unavailing. Although Agent Yasevich testified that Funderburk was "visibly upset" during the car ride, the court finds it is not uncommon that an arrested person, even a police officer, may well have been emotionally distraught under such circumstances. However, although Funderburk appeared to the agents to have been nervous, Funderburk did not experience any apparent respiratory difficulty, and did not suffer any palpable emotional break-down. TI 35; TII 18–19. Further, Funderburk remained talkative during the ride from his home to the DEA office, so much so that the agents repeatedly needed to admonish Funderburk against making any incriminating statements until after arrival at the DEA office. TI 35–37. As the agents testified, Funderburk had persisted in expressing his desire to explain away the charges. TI 37–38. As such, there can be no plausible argument that Funderburk's asserted state of emotional upset substantially interfered with his capacity to make a valid waiver of his *Miranda* rights. Significantly, Funderburk offered no testimony to support his assertions of emotional distress or an inability to sufficiently understand Yasevich's *Miranda* warnings. Funderburk fails to point to any authority to support his claim that, under the circumstances presented, his waiver was involuntary because he was emotionally upset.

## C. Admissibility of Second Statement

 Funderburk further contends that the statement he made during his confrontation with Agent Kasprzyk is inadmissible as it was not preceded by *Miranda* warnings and was involuntary. Defen-

dant's Memorandum at 11–14. Specifically, Funderburk contends that (1) the conditions of this second interrogation were hostile, because Kasprzyk accused Funderburk of lying several times to Agent Cote and described Funderburk's assertion that Funderburk had not seen Nolley in 20 years as "bullshit," Defendant's Memorandum at 13 (citing TII 82, 93–94); (2) Kasprzyk's statement to Funderburk urging Funderburk to immediately cooperate in the investigation because it would be to Funderburk's advantage was misleading as "an accused in federal court may cooperate after being represented by counsel and even derive a benefit at sentencing," Defendant's Memorandum at 13–14; (3) when Funderburk provided the incriminating second statement in response to Kasprzyk's accusation of lying, there was no evidence to suggest that Funderburk possessed any "knowledge of the rules regarding the benefits of cooperating with the government in federal court," Defendant's Memorandum at 12; (4) the second interrogation was objectively coercive; and (5) the second statement was based on an interrogation independent of that conducted by Agent Cote and therefore required further administration of *Miranda* rights to Funderburk. *Id.*

In support, Funderburk relies on *United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991), where the Second Circuit found police coerced the suspect into confessing and suppressed the suspect's statement based on the police misrepresentation regarding the suspect's opportunity to cooperate. Defendant's Memorandum at 11. However, Funderburk's reliance on *Anderson* is misplaced for several reasons. First, in *Anderson*, the agent repeatedly but falsely informed the suspect that, if he requested a lawyer, the suspect would be

unable to later cooperate and thereby benefit himself, a circumstance which did not occur in the case at bar. *Anderson, supra,* at 97. Further, unlike the defendant in *Anderson,* given Funderburk's position as a law enforcement officer, Funderburk had the training and experience with the criminal justice system to know that Kasprzyk's urging him to cooperate was typical investigative importuning and, based on his law enforcement professional experience, Funderburk could not have been reasonably misled into a belief that he must give a statement or relinquish any future chance to cooperate. Additionally, there is no evidence that Kasprzyk's questioning of Funderburk was intended to trick or coerce Funderburk into making a statement, rather, it merely informed Funderburk that the agents knew Funderburk had lied about his relationship with Nolley, providing Funderburk with an immediate chance to rectify the misstatement, thus, according to Kasprzyk, improving Funderburk's chances of obtaining favorable consideration from the agents.

In contrast to the facts in *Anderson, supra,* Funderburk was merely advised by Kasprzyk it would be in Funderburk's best interest to cooperate at that time because Funderburk was going to court for formal proceedings and that the proceedings would interrupt the opportunity for early cooperation. TII 82, 93–94. Contrary to Funderburk's contention, Defendant's Memorandum at 12–14, the Second Circuit has held that law enforcement officials are not overbearing and a defendant's statement is not thereby rendered involuntary where a defendant has been informed, "without threats or promises," that it would be in the defendant's best interest to cooperate immediately "rather than exercise his right to remain silent." *See United States v. Pomares,* 499 F.2d 1220, 1221–222 (2d Cir.), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974)

(finding a confession to be voluntary even where "federal agents had gone beyond simply urging the defendant to cooperate and had promised that he would be released on bail if he confessed.") As the court in *Pomares,* stated "the agents were free to discuss with [defendant] the reasons why he should cooperate." *Id.* at 1222.

Here, in obtaining Funderburk's second statement, the agents did not threaten or make false promises of leniency to Funderburk. Rather, Agent Kasprzyk was merely quite explicit in informing Funderburk, the agents' opinion that Funderburk had not been completely forthcoming with them when he initially denied his prior contact with Nolley. Thus, as in *Pomares, supra,* the agents in this case were free to advise Funderburk as to why he should cooperate fully at that point in the investigation. Therefore, even if the agents suggested to Funderburk should then cooperate by being completely truthful, prior to making his initial appearance in court, the court finds the agent's urging does not constitute investigatory misconduct requiring suppression under *Anderson.* Given these facts, and absent an explicit misrepresentation by either DEA agent as to any limits on Funderburk's opportunity to cooperate, Funderburk, unlike the accused in *Anderson,* could not have reasonably believed he was required to incriminate himself or be permanently precluded from obtaining future benefits by any later cooperation in the investigation.

Additionally, there is no merit in Funderburk's attack on his later questioning by Kasprzyk as being without a further administration of *Miranda* warnings. It is conceded that Funderburk had been advised of his constitutional rights immediately prior to Agent Cote's first interrogation, and "Miranda and its progeny do not require the defendant to have his rights

re-administered after each break in questioning." *Plume v. Conway,* 2006 WL 1789134 * 5 (W.D.N.Y.2006). As the interval between Cote's and Kasprzyk's questioning of Funderburk was only 30–45 minutes, the court finds that, as with the defendant in *Plume,* Funderburk was in continuous custody and therefore re-administration of his *Miranda* rights prior to the second encounter with Agents Kasprzyk and Cote was not required. *Id.* Further, because Funderburk was an experienced Buffalo police officer, Funderburk was (i) well-familiar with law enforcement investigative techniques in questioning suspects, and (ii) was not subjected to any physical deprivations such as refusal of food or drink or use of toilet facilities, both factors point away from any need to repeat the *Miranda* warnings prior to Agent Kasprzyk confronting Funderburk about his apparent untruths regarding his prior contact with Nolley. Given that the second round of questioning related directly to the first, and without a lengthy break, Funderburk's contention that additional *Miranda* warnings were required, upon encountering Kasprzyk, is meritless. Funderburk cites no authority to support this contention. Based on the foregoing, the court finds Funderburk's statement, in response to Agent Kasprzyk's questioning made during the second phase of Funderburk's interrogation is therefore admissible.

The court therefore turns to Funderburk's contention that the conditions of the second interrogation were hostile and, as such, this fact demonstrates the involuntariness of Funderburk's second statement. As stated, Agent Kasprzyk confronted Funderburk with Funderburk's assertion that he had not seen Nolley in 20 years, stating that was "pretty much bullshit," which, based on the intercepted conversations and surveillance of Funderburk and Nolley meeting in the city park,

the agents had a good reason to believe was the case. TII 82.

Under the Fifth Amendment, a confession "must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Brady v. United States,* 397 U.S. 742, 753, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) *(quoting Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897)); see also *Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (a person "must not have been compelled to incriminate himself"). The test of voluntariness of a confession is to be determined by viewing the totality of the circumstances and assessing whether the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined...." *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); *accord United States v. Alvarado,* 882 F.2d 645, 649 (2d Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990); *United States v. Guarno,* 819 F.2d 28, 30 (2d Cir.1987); *United States v. Ferrara,* 377 F.2d 16, 17 (2d Cir.1967), *cert. denied,* 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967). The totality of the circumstances include defendant's age and education, whether the defendant was advised of his constitutional rights, the length of the interview and the type of questioning, and the use of physical deprivations. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Additionally, the court should consider the conditions of the interrogation and the conduct of law enforcement officials conducting the questioning and Funderburk's experience with the criminal justice system. *Anderson,*

929 F.2d at 99; *Green v. Scully,* 850 F.2d 894, 901–02 (2d Cir.), *cert. denied,* 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988).

In the instant case, the court finds neither the conditions of the second interrogation by Kasprzyk and Cote nor the conduct of the agents in conducting the later interrogation demonstrate Funderburk's admissions to be involuntary. Specifically, the court finds that Agent Kasprzyk's comments to Funderburk were not intended to trick, coerce or cajole Funderburk, but, rather, straightforwardly to confront him with the investigators' knowledge about his prior contacts with Nolley, and convey frankly to Funderburk their awareness that Funderburk's initial denials on this important question were significantly incomplete and inaccurate providing an immediate chance to cooperate.

Funderburk further argues that the later interrogation was conducted in a small room, implying this fact should persuade the court of the second statement's involuntariness. Defendant's Memorandum at 12. However, "[t]he fact that the questioning took place in close quarters is not significant in determining whether [a defendant's] statements were voluntary." *Anderson, supra,* at 99. Based on the record, it is unlikely that Funderburk experienced any significant mental or physical distress that had conceivably overborne Funderburk's will during the second interrogation. While his confrontation with Agent Kasprzyk may well have been somewhat unpleasant for Funderburk, given his recent *Miranda* admonitions, his previously expressed desire to cooperate, and his experience as a police officer with law enforcement investigative procedures, Funderburk cannot reasonably assert that his statements in responding to Agent Kasprzyk's demand for candor and truthfulness resulted from oppressive law enforcement misconduct. Thus, Funderburk's

contention that the second interrogation was coercive because the conduct of the agents in conducting the interrogation, particularly Agent Kasprzyk, was "hostile," Defendant's Memorandum at 13–14, must be rejected.

Finally, Funderburk claims the second statement was involuntary because he lacked "knowledge of the rules regarding the benefits of cooperating with the government in federal court," Defendant's Memorandum at 12, suggesting that Funderburk's law enforcement background is irrelevant to whether his statements were voluntary in this federal prosecution, and that he was thus unfairly misled by Kasprzyk as to the need to immediately 'come clean' about his prior contact with Nolley. *Id.* at 12–14. Although Funderburk again relies on *Anderson, supra,* the court finds *Anderson* is inapposite on this point for several reasons.

First, although in *Anderson* the accused had been previously arrested, no evidence supported a finding that such prior experience obviated the need for *Miranda* warnings or completely truthful advice relative to future cooperation. *Anderson, supra,* at 99. Here, Funderburk indisputably received his *Miranda* warnings almost immediately upon coming into custody, and Funderburk points to no affirmative misrepresentation by the agents as to the scope of Funderburk's opportunity to cooperate with the DEA in return for possible plea bargaining benefits. In contrast with the defendant in *Anderson,* Funderburk, as an experienced police officer, did not labor under limitations regarding the nature of *Miranda's* protections or, more particularly, the chance for future cooperation by an accused. Moreover, Funderburk's suggestion that his lack of specific experience in connection with a federal criminal investigations is somehow relevant to the issue of voluntariness, Defen-

dant's Memorandum at 12, constitutes a theory in search of its facts. Funderburk fails to point to any substantive differences between New York state and federal criminal law or procedure in regard to a narcotics investigation that could conceivably support finding there is any material variance between the two systems such that Funderburk was prejudiced by Agent Kasprzyk's urging that he promptly cooperate.

## CONCLUSION

Based on the foregoing, Defendant's motions to suppress contained in Defendant's omnibus motion (Doc. No. 189) and as raised at the proceedings on December 15, 2005 (Doc. No. 284) and December 19, 2005 (Doc. No. 288), should be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Government and the Defendant.

SO ORDERED.

Sept. 18, 2006.